UNITED STATES of America,
Plaintiff–Appellee,

v.

Mary Dangerfield BENGIVENGA,
Defendant–Appellant.

No. 86–2394.

United States Court of Appeals,
Fifth Circuit.

May 25, 1988.

Frank M. Garza, Canales & Associates, Corpus Christi, Tex., for defendant-appellant.

Susan L. Yarbrough, James R. Gough, Asst. U.S. Attys., Henry K. Oncken, U.S. Atty., Houston, Tex., Mervyn Hamburg, Crim. Div., Appellate Section, U.S. Dept. of Justice, Washington D.C., for plaintiff-appellee.

Before CLARK, Chief Judge, GOLDBERG, GEE, RUBIN, REAVLEY, POLITZ, KING, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, and SMITH, Circuit Judges.

CLARK, Chief Judge:

A jury found Mary Dangerfield Bengivenga guilty of possessing marijuana with intent to distribute. A panel of this court reversed the conviction because the district court had denied Bengivenga's motion to suppress evidence obtained before border patrol agents administered *Miranda* warnings.[1] Our order granting rehearing en banc vacated the panel's holding. We now affirm the conviction because Bengivenga was not "in custody" prior to her formal arrest and because, if a *Miranda* violation occurred, that alone would neither require exclusion of nontestimonial evidence nor trigger the derivative evidence rule.

## I. FACTS

On February 1, 1986, shortly after midnight, Border Patrol Agents Santana and Ramos stopped a commercial bus at a fixed checkpoint located seven miles south of Falfurrias, Texas. Agent Santana boarded the bus at the secondary inspection point to conduct a routine citizenship check of the ten to fifteen passengers while Agent Ramos watched the exits. Two of the passengers, Bengivenga and a female companion, told Agent Santana that they were bound for Alice, Texas, a small town fifty miles north of the checkpoint.

After completing the citizenship check, Agent Santana left the bus to examine the luggage bins for illegal aliens. In the front compartment he detected a strong marijuana odor emanating from three similar suitcases. Agent Ramos confirmed this suspicion and the two agents removed the three suitcases from the luggage bin. The agents inspected the baggage claim tags and discovered that the suitcases were destined for Alice. Throughout this luggage inspection, the agents observed Bengivenga and her companion peering nervously out the bus window.

Santana then informed Ramos that those two women were the only passengers who said they were traveling to Alice. Agent Ramos boarded the bus and first asked two men sitting in front of the women about their destination to determine whether they might be involved in smuggling the marijuana. When the men indicated that they were bound for San Antonio, Ramos proceeded to ask the women their destination and whether they had any luggage. They responded that they were bound for Alice and that they had not checked any luggage. Ramos then requested that they "please" step off the bus for further questioning. Ramos testified that further questioning is customarily done off the bus to avoid embarrassment to the suspect and to ensure the safety of the other passengers.

As they exited the bus, Ramos asked the women whether they owned the three suitcases. The women denied ownership. Ramos and Santana carried the luggage into the checkpoint trailer and requested the two women to accompany them. Agent Santana began filling out a baggage receipt form for the bus driver who was already in the trailer drinking coffee. In response to a question, the women again nervously denied that the suitcases belonged to them. Agent Ramos then requested the women to produce their bus tickets. When Bengivenga opened the envelope containing her ticket, Ramos noticed three baggage claim stubs which he asked to see. After matching the stubs to the baggage claim tags on the suitcases, Agent Ramos arrested the two women, advised them of their constitutional rights and opened the luggage. The agents found twenty-four kilograms of marijuana inside the suitcases.[2] Approximately a minute

---

1. *United States v. Bengivenga,* 811 F.2d 853 (5th Cir.1987).

2. The district court held that the warrantless search of the luggage did not contravene the Fourth Amendment because the Falfurrias checkpoint had been recognized as a functional equivalent of the border. *See United States v. Salinas,* 611 F.2d 128 (5th Cir.1980). Although this circuit has previously authorized plenary searches at such checkpoints, we recently re-

and a half elapsed between the time the women entered the trailer and the time of their arrest.

Before her trial, Bengivenga moved to suppress her statements to the agents, her bus ticket, the baggage claim stubs and the marijuana arguing that she was "in custody" and entitled to *Miranda* warnings prior to being questioned in the trailer. Agent Ramos testified at the suppression hearing that he believed Bengivenga was free to refuse to accompany him to the trailer and he did not possess probable cause to arrest until he examined the baggage claim stubs. The district court denied the motion to suppress. At trial, the prosecution introduced the baggage claim stubs. Agent Ramos also testified at the trial that Bengivenga produced her bus ticket, that he observed baggage claim stubs in Bengivenga's ticket envelope and that he matched the stubs to baggage claim tags on the suitcases containing marijuana.

## II. IN CUSTODY

*Miranda* warnings must be administered prior to "custodial interrogation."[3] The issue in this case is whether Bengivenga was "in custody" prior to producing her bus ticket and baggage claim stubs.

### A. The Four Factor Test

This circuit has considered four factors on a case-by-case basis to determine whether a person is "in custody." These factors are (1) whether there was probable cause to arrest the defendant, (2) whether the investigation was focused on the defendant at the time of interrogation, (3) whether the law enforcement officer had a subjective intent to hold the defendant, and (4) whether the defendant subjectively believed that her freedom was significantly restricted.[4] Custody did not require the presence of all factors,[5] but more than one factor had to be present.[6]

The district court held that Bengivenga was not in custody under this four factor test. First, the district court concluded that probable cause to arrest did not arise until after Bengivenga produced the baggage claim stubs and Agent Ramos matched them to the suitcases. Second, the district court found that the agents subjectively intended to restrict Bengivenga's freedom of movement for only a limited and brief investigation of suspicious circumstances. Third, Bengivenga did not testify at the suppression hearing. The district court also found that the objective facts did not support an inference that Bengivenga believed she was in custody. Finally, although the investigation had fo-

fused to uphold plenary searches at the Sierra Blanca fixed checkpoint on a functional equivalency of the border theory. *United States v. Jackson,* 825 F.2d 853, 860–62 (5th Cir.1987) (en banc), *cert. denied sub nom. Ryan v. United States,* — U.S. —, 108 S.Ct. 711, 98 L.Ed.2d 661, *cert. denied sub nom. Browning v. United States,* — U.S. —, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988). In *Jackson,* we nonetheless declined to suppress any evidence because the deterrence rationale of the exclusionary rule would not be advanced where agents acted in good faith reliance on our prior precedent. *Id.* at 865–66. Without considering whether the search of Bengivenga's luggage might be justified on a theory other than functional equivalency, we simply note that the exclusionary rule would not apply to the marijuana because the agents conducted the search in good faith prior to our decision in *Jackson. Id.* at 866.

3. Absent "other fully effective means," a person subjected to custodial interrogation

must be warned prior to any questioning that he has the right to remain silent, that any-

thing he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. *Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966).

4. *See, e.g., United States v. Warren,* 578 F.2d 1058, 1071 (5th Cir.1978) (en banc), *cert. denied,* 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980).

5. *See, e.g., United States v. Jordan,* 557 F.2d 1081, 1083–84 (5th Cir.1977) (absence of probable cause does not preclude a finding of custody when the other three factors are present); *Alberti v. Estelle,* 524 F.2d 1265, 1267 (5th Cir. 1975) (probable cause plus focus establish custody), *cert. denied,* 426 U.S. 954, 96 S.Ct. 3181, 40 L.Ed.2d 1193 (1976).

6. *See, e.g., Brown v. Beto,* 468 F.2d 1284, 1286 (5th Cir.1972) ("none of those factors is alone determinative").

cused upon Bengivenga and her companion, the district court held that this factor alone was insufficient to render the interrogation custodial.

On appeal, the panel held that Bengivenga was in custody before being questioned in the trailer because the agents, in addition to having focused their investigation on the women, had probable cause to arrest. *United States v. Bengivenga*, 811 F.2d 853, 855 (5th Cir.1987). The panel, unlike this en banc court, was constrained by our past precedent. For the following reasons, we conclude that our four factor custody test is no longer compatible with Supreme Court precedent and must be abandoned in favor of the analysis we adopt today.

### B. The Reasonable Person Test

■ The *Miranda* Court first defined "custodial interrogation" to "mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."[7] The meaning of custody has been refined so "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with formal arrest."[8] The Supreme Court has also explained that "the only relevant inquiry is how a reasonable man in the suspect's position would have understood the situation."[9] A suspect is therefore "in custody" for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest. The reasonable person through whom we view the situation must be neutral to the environment and to the purposes of the investigation—that is, neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances.

### 1. Factoring out the Four Factor Test

Although the task of defining custody can be "a slippery one,"[10] Supreme Court precedent has substantially undermined the four factors comprising our custody test. First, the existence of probable cause to arrest is largely immaterial to the question of custody. In a case holding that traffic stops do not ordinarily place a motorist in custody, the Court rejected the position that custody arises as soon as the level of suspicion amounts to probable cause to arrest. *Berkemer v. McCarty*, 468 U.S. 420, 435 n. 22, 104 S.Ct. 3138, 3148 n. 22, 82 L.Ed.2d 317 (1984).

> The threat to a citizen's Fifth Amendment rights that *Miranda* was designed to neutralize has little to do with the strength of an interrogating officer's suspicions. And, by requiring a policeman conversing with a motorist constantly to monitor the information available to him to determine when it becomes sufficient to establish probable cause, the [proposed rule] would be extremely difficult to administer.

*Id.* Police officers are not required to effectuate an arrest the moment probable cause arises.[11] Regardless of the presence

---

7. *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612 (footnote omitted); *see also id.* at 477, 478, 86 S.Ct. at 1629, 1630.

8. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (per curiam)); *see also Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984); *Minnesota v. Murphy*, 465 U.S. 420, 430–31, 104 S.Ct. 1136, 1144, 79 L.Ed.2d 409 (1984).

9. *Berkemer*, 468 U.S. at 442, 104 S.Ct. at 3151 (footnote omitted).

10. *Oregon v. Elstad*, 470 U.S. 298, 309, 105 S.Ct. 1285, 1293, 84 L.Ed.2d 222 (1985).

11. There is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall short of the amount necessary to support a criminal conviction.

of probable cause, until an officer acts to exert some type of restraint a suspect cannot reasonably believe her freedom is restrained.

The Supreme Court has also made it clear that focus alone does not create *Miranda* custody.[12] Acknowledging this rule,[13] our cases have held that custody arises when focus is coupled with another factor such as probable cause.[14] Even this approach remains problematic because the exertion of restraint no more accompanies focus than it does probable cause. In particular, the presence of probable cause and focus often adds little to the custody equation because facts that establish these two factors tend to coalesce.[15] Probable cause and focus become material to the custody inquiry only when they influence a reasonable person's perception of the situation.[16] To consider these factors in any other light may hamper legitimate police practices that do not threaten Fifth Amendment rights.

Finally, both our third and fourth factors —the unrevealed subjective intent of the law enforcement officer and the subjective belief of the suspect—are irrelevant to the custody determination. The Supreme

Court recently stated that "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."[17] Consideration of the subjective belief of the suspect may have an apparent logical soundness because "a person who honestly but unreasonably believes he is in custody is subject to the same coercive pressures" as one whose belief is reasonable.[18] But the Supreme Court adopted a reasonable person test because it " 'is not solely dependent either on the self-serving declarations of the police officers or the defendant nor does it place upon the police the burden of anticipating the frailties or idiosyncracies of every person whom they question.' "[19]

### 2. *Miranda* Custody and Fourth Amendment Seizures

In the past, we have questioned the relationship between *Miranda* custody and the Fourth Amendment's proscription of unreasonable seizures. *See, e.g., United States v. Brunson*, 549 F.2d 348, 356 n. 9 (5th

*Hoffa v. United States*, 385 U.S. 293, 310, 87 S.Ct. 408, 417, 17 L.Ed.2d 374 (1966) (footnote omitted).

**12.** *Murphy*, 465 U.S. at 431, 104 S.Ct. at 1144 ("[t]he mere fact that an investigation has focused on a suspect *does not trigger the need for Miranda warnings in noncustodial settings*"); *see also Beheler*, 463 U.S. at 1124 & n. 2, 103 S.Ct. at 3519 & n. 2; *Mathiason*, 429 U.S. at 495, 97 S.Ct. at 714; *Beckwith v. United States*, 425 U.S. 341, 347, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1 (1976).

**13.** *United States v. Alvarado Garcia*, 781 F.2d 422, 426 (5th Cir.1986).

**14.** *Alberti*, 524 F.2d at 1267–68 (criticizing the focus-plus-probable-cause rule).

**15.** The difficulty with the focus-plus-probable-cause rule is most apparent where undercover agents infiltrate drug rings or other criminal activity. In such circumstances, criminals frequently make incriminating statements in response to questions posed after an agent has probable cause and the investigation has focused on the suspect. We generally have held that such situations provide no basis to infer coercion. *See, e.g., United States v. Marks*, 603 F.2d 582, 584 (5th Cir.1979) (per curiam) (even if focus and probable cause existed, statements

made to undercover agents "were uttered in a context completely free from coercion"), *cert. denied*, 444 U.S. 1018, 100 S.Ct. 673, 62 L.Ed.2d 649 (1980).

**16.** The *awareness* of the person being questioned by an officer that he has become the "focal point" of the investigation, or that the police already have ample cause to arrest him, may well lead him *to conclude, as a reasonable person,* that he is not free to leave, that *he has* been significantly deprived of his freedom.... Kamisar, *"Custodial Interrogation" Within the Meaning of Miranda, in* Criminal Law and the Constitution 355, 371 (Inst. for Cont.Educ. 1968) (emphasis in original).

**17.** *Berkemer*, 468 U.S. at 442, 104 S.Ct. at 3151 (footnote omitted); *see also Murphy*, 465 U.S. at 431, 104 S.Ct. at 1144 (the intent of a probation officer who questions a probationer is immaterial to the custody issue).

**18.** *Mathiason*, 429 U.S. at 497 n. 1, 97 S.Ct. at 715 n. 1 (Marshall, J., dissenting).

**19.** *Berkemer*, 468 U.S. at 442 n. 35, 104 S.Ct. at 3151 n. 35 (quoting *People v. P.*, 21 N.Y.2d 1, 9–10, 233 N.E.2d 255, 260, 286 N.Y.S.2d 225, 232 (1967)).

Cir.), *cert. denied,* 434 U.S. 842, 98 S.Ct. 140, 54 L.Ed.2d 107 (1977). We know that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." [20] But a Fourth Amendment seizure does not necessarily render a person in custody for purposes of *Miranda.* For example, traffic stops—stops which constitute a Fourth Amendment seizure [21]—do not automatically place a person in custody for purposes of *Miranda.* [22] In *Brunson,* 549 F.2d at 357 n. 12, a panel of this court noted that "the core meaning both of 'seizure' in the Fourth Amendment sense, and of 'custody' in the *Miranda* sense, appears to be the same: the restraint of a person's 'freedom to walk away' from the police." The critical difference between the two concepts, however, is that custody arises only if the restraint on freedom is a certain degree—the degree associated with formal arrest.

### C. Application of the Reasonable Person Test

A stop at a fixed checkpoint constitutes a Fourth Amendment seizure [23]—a reasonable person would believe that she was not free to leave. Bengivenga was seized from the time that her bus was stopped at the checkpoint until her arrest, but her situation, as understood by a reasonable person, did not at any time prior to production of the baggage claim stubs involve a degree of restraint associated with formal arrest.

#### 1. Routine Citizenship Checks at Fixed Checkpoints

■ Routine citizenship checks at fixed checkpoints are characterized by the same two features important to *Berkemer*'s holding that an ordinary traffic stop does not render a motorist in custody. First, traffic stops are "presumptively temporary and brief." *Berkemer,* 468 U.S. at 437, 104 S.Ct. at 3149.

> The vast majority of roadside detentions last only a few minutes. A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way.

*Id.* Stationhouse interrogation, on the other hand, frequently may be prolonged and a reasonable person might expect questioning to continue "until he provides his interrogators the answers they seek." *Id.* at 437–38, 104 S.Ct. at 3149. Second, traffic stops are less "police dominated" than stationhouse interrogations. *Id.* at 438–39, 104 S.Ct. at 3149–50. The public nature of traffic stops reduces the hazard that police might resort to overbearing means to elicit incriminating responses and diminishes the motorist's fear of abuse by the police if he fails to cooperate. *Id.* at 438, 104 S.Ct. at 3149. That no more than one or two police officers usually participate in a traffic stop also mitigates a motorist's sense of vulnerability. *Id.*

A routine checkpoint stop involves "brief detention," limited questioning and possibly production of a relevant document. [24] The degree of restraint associated with arrest is more enduring and less circumspect.

---

**20.** *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (footnote omitted); *see also INS v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984).

**21.** *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979) ("stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth Amendment], even though the purpose of the stop is limited and the resulting detention quite brief").

**22.** *Berkemer,* 468 U.S. at 440, 104 S.Ct. at 3150.

**23.** *United States v. Martinez-Fuerte,* 428 U.S. 543, 556, 96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116 (1976).

**24.** *Id.* 428 U.S. at 558, 96 S.Ct. at 3083. Government statistics indicate that "the average length of an investigation in the secondary inspection area [at the San Clemente checkpoint] is three to five minutes." *Id.* at 546–47, 96 S.Ct. at 3078. Agent Ramos testified that citizenship checks on buses usually take "thirty seconds to five minutes," depending on the number of passengers.

A fixed checkpoint mitigates the "subjective" fear a reasonable person might otherwise experience when their vehicle is stopped by border patrol agents. *Id.* at 558–59, 96 S.Ct. at 3083. Fixed checkpoints do not take travelers "by surprise as they know, or may obtain knowledge of, the location of checkpoints and will not be stopped elsewhere." *Id.* at 559, 96 S.Ct. at 3083. The law enforcement presence at a fixed checkpoint actually assuages the reasonable person's perception of restraint: "The regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and believed to serve the public interest." *Id.* Even for those travelers directed to secondary inspection points, "[t]he objective intrusion of the stop and inquiry ... remains minimal." *Id.* at 560, 96 S.Ct. at 3084. Like a traffic stop, routine citizenship checks usually take place in the view of other travelers and are usually conducted by one or two officers. Routine citizenship checks at fixed checkpoints do not impose a degree of restraint associated with arrest because the detention is by nature brief and subject to the scrutiny of other travelers, the intrusion is limited in scope, advance notice obtains and visible signs of authority mitigate rather than enhance the perceived degree of restraint. Bengivenga therefore was not in custody at the time Agent Santana questioned her on the bus.

## 2. Investigation of Drug Smuggling

■ Once the agents discovered the suitcases suspected of containing marijuana, their activity shifted from a routine checkpoint stop aimed at detecting illegal aliens to an investigation of drug smuggling. That Bengivenga and her companion were the only passengers destined for the same town as the suitcases which smelled of marijuana coupled with their nervous behavior during the search of the luggage bins made them prime suspects. But the agents, believing that they did not possess probable cause, engaged in further conduct

more analogous to a noncustodial investigative stop than a formal arrest.

Officers possessing reasonable articulable suspicion of a person's participation in criminal activity may seize the suspect in accord with the Fourth Amendment to conduct an investigative stop—a narrow intrusion involving limited detention accompanied by brief questioning and, if justified, a frisk for weapons.[25] Such investigative stops do not render a person in custody for purposes of *Miranda. Berkemer,* 468 U.S. at 439–40, 104 S.Ct. at 3150. When Agent Ramos boarded the bus and asked the two women their destination and whether they had any luggage, he was conducting a noncustodial investigation. The women's answers did not completely allay his suspicion because they reconfirmed that their destination coincided with the destination of the luggage. Neither did the questions asked at this time exhaust the permissible scope of investigative questioning. In accord with a policy designed to assure the safety of the agents and the other passengers, Ramos requested the women to exit the bus. As in *Berkemer,* 468 U.S. at 441–42, 104 S.Ct. at 3151, where an officer asked a motorist to step out of his car and to perform a sobriety test, simply asking passengers to step off a bus and inquiring about ownership of luggage does not render a suspect in custody.

The agents then escorted Bengivenga and her companion to the nearby checkpoint trailer to continue the questioning. Several factors counteract the effect that moving a suspect from a bus to a building maintained by law enforcement personnel would ordinarily have on a reasonable person's perception of the situation and the degree of restraint imposed. First, the trailer was only a short distance from the bus. Second, the conduct of the agents remained subject to the public scrutiny to the extent that the bus driver was actually present in the trailer drinking coffee. The agents did not completely isolate the women in an interrogation room. Third, the

---

**25.** See *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889 (1968), and its progeny.

number of agents did not increase. Only five people were present in the trailer—the bus driver, the two women and the two agents. Changing the locus of the questioning to the trailer had the advantage of eliminating the potentially embarrassing presence of other bus passengers. With Agent Santana preoccupied with completing a baggage receipt form for the bus driver, it was unlikely that the agents might team up to overbear Bengivenga's will.[26] Finally, a reasonable person in Bengivenga's position would have understood that so long as the bus driver remained in the trailer the bus would not depart and if everything checked out she would shortly rejoin the other passengers on the bus.

Other than being moved to the nearby trailer, the objective facts do not indicate that the border agents imposed a degree of restraint associated with formal arrest. The agents did not communicate the basis for their suspicions. Their reluctance to assert restraint stemmed from their belief that they did not possess probable cause until after they matched the baggage claim stubs to the three suitcases. At no time during the minute and a half that elapsed in the trailer before formal arrest was Bengivenga given any reason to believe that her detention would be other than temporary. Nor did the nature of the questioning intensify once inside the trailer. The incriminating baggage claim stubs inadvertently surfaced in response to a request to see Bengivenga's bus ticket, a question likely to be routinely asked of any bus passenger who becomes the object of an investigative stop. Rather than successive confrontations with the border agents, Bengivenga was subjected to no more than a routine citizenship check that quickly progressed from an investigative stop to her formal arrest. At no time prior to production of the baggage claim stubs did this situation, as understood by a neutral and reasonable person in Bengivenga's position,

involve the degree of restraint associated with formal arrest.

## III. NONTESTIMONIAL EVIDENCE AND THE FRUIT OF THE POISONOUS TREE DOCTRINE

Assuming Bengivenga was in custody at the time of the interrogation in the trailer, we would affirm her conviction because a *Miranda* violation would not require suppression of the evidence introduced at her trial.

### A. Nontestimonial Evidence

■ The privilege against self-incrimination "applies only when the accused is compelled to make a *testimonial* communication that is incriminating." *Fisher v. United States,* 425 U.S. 391, 408, 96 S.Ct. 1569, 1579, 48 L.Ed.2d 39 (1976) (emphasis in original). This privilege ordinarily does not apply to nontestimonial evidence. *See, e.g., Schmerber v. California,* 384 U.S. 757, 764, 86 S.Ct. 1826, 1832, 16 L.Ed.2d 908 (1966) (suspect may be compelled to supply incriminating blood samples). A violation of *Miranda* rules, rules fashioned to secure the Fifth Amendment's privilege during custodial interrogation,[27] necessitates only the exclusion of testimonial evidence from the prosecution's case in chief.[28] The bus ticket and baggage claim stubs are nontestimonial physical evidence and would not be excludable even if they had been obtained in violation of *Miranda.*

Bengivenga also urges that her acts of producing the bus ticket and baggage claim stubs constitute statements for *Miranda* purposes. We hold, however, that Bengivenga's act of producing her bus ticket is not a statement for *Miranda* purposes. Every passenger on the bus must purchase a ticket. The implicit admission of the existence and possession of a bus ticket that accompanies the act of its production does not rise "to the level of testimony within the protection of the Fifth Amend-

---

**26.** *Compare Berkemer,* 468 U.S. at 438 n. 27, 104 S.Ct. at 3149 n. 27.

**27.** *Miranda v. Arizona,* 384 U.S. 436, 458, 86 S.Ct. 1602, 1619, 16 L.Ed.2d 694 (1966).

**28.** *See Oregon v. Elstad,* 470 U.S. 298, 307, 105 S.Ct. 1285, 1292, 84 L.Ed.2d 222 (1985).

ment" because existence and possession of a bus ticket are a "foregone conclusion." *Fisher*, 425 U.S. at 411, 96 S.Ct. at 1581.

Whether the act of producing the baggage claim stubs could be a statement for *Miranda* purposes in some other context is beside the mark for the prosecution independently established the existence and possession of the stubs. As Bengivenga produced her bus ticket, an act we hold to be nontestimonial, Agent Ramos observed baggage claim stubs inside her ticket envelope. The fact that Bengivenga complied with the subsequent request by Agent Ramos to produce those stubs does not alter the nontestimonial nature of his observations. At trial, Agent Ramos testified only to the observations he made before Bengivenga produced the baggage claim stubs and to the fact that he linked those stubs to the suitcases containing marijuana. The prosecution thereby established the existence of the stubs and their possession by Bengivenga without reference to how they were produced.

### B. The Fruit of the Poisonous Tree Doctrine

■ Even nontestimonial evidence, according to Bengivenga, must be suppressed if it is tainted by custodial interrogation that occurs in violation of *Miranda.* This contention is contrary to the rule that a mere violation of *Miranda*'s "prophylactic" procedures does not trigger the fruit of the poisonous tree doctrine. The derivative evidence rule operates only when an actual constitutional violation occurs, as where a suspect confesses in response to coercion.[29] None of the tactics employed by the agents were "so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton*, 474 U.S.

104, 109, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985). Agent Ramos politely requested Bengivenga and her companion to accompany him to the nearby checkpoint trailer where they were questioned for about a minute and a half. Bengivenga remained resolute throughout her entire encounter with the agents; she never admitted ownership of the suitcases. None of the evidence introduced at Bengivenga's trial should have been excluded under the derivative evidence rule because the record is simply barren of any evidence of coercion.[30]

## IV. CONCLUSION

The agents were not required to administer *Miranda* warnings before questioning Bengivenga. At no point prior to production of the baggage claim stubs was she in custody. Even if Bengivenga was placed in custody upon entering the checkpoint trailer, the evidence introduced at trial should not have been suppressed because it was nontestimonial and the derivative evidence rule was not triggered by an actual constitutional violation. For these reasons, the conviction appealed from is

AFFIRMED.

ALVIN B. RUBIN, Circuit Judge, concurring:

I concur in the result and all of the opinion except Part III, which discusses an issue that we need not now decide.

GOLDBERG, Circuit Judge, with whom POLITZ, JOHNSON and WILLIAMS, Circuit Judges, join dissenting:

Today the majority chooses to reject this Circuit's longstanding test for determining whether a suspect is in custody.[1] Judge

---

**29.** *See, e.g., Id.* 470 U.S. at 305–309, 105 S.Ct. at 1291–93 (successive confessions); *United States v. Cherry*, 759 F.2d 1196, 1209 & n. 20 (5th Cir.1985) (derivative physical evidence).

**30.** *Compare Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (four hour interrogation of sedated defendant in an intensive-care unit elicited involuntary statements); *Davis v. North Carolina*, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966) (sixteen days of

incommunicado interrogation and coercive tactics designed to undermine alibi elicited involuntary statements).

**1.** *United States v. Alvarado Garcia*, 781 F.2d 422 (5th Cir.1986); *United States v. Warren*, 612 F.2d 887 (5th Cir.) (en banc), *cert. denied*, 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980); *United States v. Henry*, 604 F.2d 908, 915 (5th Cir.1979); *Brown v. Beto*, 468 F.2d 1284, 1286 (5th Cir.1972).

Clark's fine opinion has convinced me that the Supreme Court has specifically rejected each element of our old four part test, and mandated an objective standard. I dissent, not because I would disinter the old test, but instead because I disagree with the majority's application of their newly fashioned standard. The rejection of the four part test is merely a change in technique. My concern is that the new standard be applied in a manner that is consistent with the underlying constitutional and prophylactic principles stated in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The majority states, and I agree, that a person is in custody when the police have imposed a restraint on liberty of a degree a reasonable person would associate with an arrest. To my mind, however, applying this standard, Ms. Bengivenga was in custody from the moment that she crossed the threshold of the checkpoint trailer. From that moment forward, a reasonable person would have found the circumstances indistinguishable from a formal arrest, and the inherently coercive aspects of custodial questioning came into play. I also disagree with the majority's conclusions that the Fifth Amendment exclusionary rule does not apply because the baggage claim stubs were non-testimonial in and of themselves, and, that they cannot be excluded as fruit of the poisoned tree, because there was only a *Miranda* violation, not a constitutional violation. It was the act of producing the ticket and the baggage stubs that was testimonial, not the documents themselves, and that act of production occurred in an inherently coercive context. Without the act of production to link the ticket stubs to Ms. Bengivenga, the stubs themselves were meaningless.

## I. THE HALLMARKS OF CUSTODY

### A. Inherent Coercion

The Fifth Amendment guards only against coerced confessions. In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), however, the Court noted the natural tendency of custodial interrogation to overbear the will of suspects,

saying, "Even without employing brutality, [or] the 'third degree[,]' . . . the very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals." 384 U.S. at 455, 86 S.Ct. at 1617–18. Because of this inherent coercion we now apply a conclusive presumption that evidence produced by custodial interrogation was coerced, unless the suspect was informed of his rights. 384 U.S. at 478, 86 S.Ct. at 1630.

Today the majority fashions and applies a new standard for determining whether a suspect is in custody. In determining how to apply that standard, a page of history may be worth a pound of logic. We must look to the concerns that informed *Miranda* to determine when a factual situation contains those elements of inherent coercion that led the court to require *Miranda* warnings.

### B. Privacy and Duration

The *Miranda* Court carefully examined police practices and focused on certain elements inherent in custody that rendered it coercive. In police manuals current at the time, two elements were noted to be particularly effective at overbearing the will of a suspect: privacy and the prospect of questioning for an indefinite period.

First, the Court noted the efficacy of privacy saying:

> The officers are told by the manuals that the "principal psychological factor contributing to successful interrogation is privacy—being alone with the person under interrogation."

*Id.* at 449, 86 S.Ct. at 1615 (quoting Inbau & Reid, *Criminal Interrogation and Confessions* 1 (1962)). The Court noted that the manuals further advised:

> If at all practicable, the interrogation should take place in the investigator's office or at least in a room of his own choice. The subject should be deprived of every psychological advantage. In his own home he may be confident, indignant, or recalcitrant. He is more keenly aware of his rights and more reluctant to tell of his indiscretions or criminal behav-

ior within the walls of his own home. Moreover his family and other friends are nearby, their presence lending moral support. In his office, the investigator possesses all the advantages. The atmosphere suggests the invincibility of the forces of the law.

*Id.* (quoting O'Hara, *Fundamentals of Criminal Investigation* 99 (1956)).

Second, the Court noted that the manuals focused on the prospect of indefinite interrogation. They encouraged the investigator to be "patien[t]," and to "persever[e]":

Where emotional appeals are employed to no avail, [the investigator] must rely on an oppressive atmosphere of dogged persistence. He must interrogate steadily and without relent, leaving the subject no prospect of surcease.

*Id.* at 451, 86 S.Ct. at 1615 (quoting O'Hara at 112).

Both privacy and the prospect of indefinite interrogation were the hallmarks of custodial interrogation which led the Court to apply a conclusive presumption to custodial interrogation, saying that:

Without proper safeguards the process of in custody interrogation of persons suspected or accused of crimes contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.

*Id.* at 467, 86 S.Ct. at 1624. The Court therefore held that "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way," that individual must be advised of his constitutional rights. *Id.* at 478, 86 S.Ct. at 1630.

Determining why a suspect must receive *Miranda* warnings only begins the inquiry into when and under what circumstances such warnings are necessary. The majority takes note of these whys, but comes to an erroneous conclusion about when. They note the importance of privacy and indefinite duration, but fail to see that these hallmarks of inherently coercive custody

are present in the factual situation of this case.

## II. DEFINING CUSTODY BY REFERENCE TO INHERENT COERCION

As the majority explains, not all Fourth Amendment seizures constitute custody. For example, a traffic stop constitutes a seizure, but does not entitle a suspect to *Miranda* warnings. Similarly, a police officer may ask an airline passenger for his or her ticket on the main concourse of the airport or in the baggage claim area, without that individual being deemed in custody.[2] A suspect's freedom must be more than restricted. It must be restricted in a "significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612. The "restraint" must be "of the degree associated with a formal arrest." *Berkemer v. McCarty*, 468 U.S. at 440, 104 S.Ct. at 3150, 82 L.Ed.2d 317 (1984).

This distinction between seizure and custody creates a necessarily circular inquiry. Custody is defined not by any extrinsic characteristic. The locution "restraint of the degree associated with formal arrest" does little more than establish the distinction. It does not draw the line. The majority quite properly seeks a way out of this conundrum by looking to the dangers of custody highlighted in *Miranda*. They focus on privacy and the prospect of indefinite duration, but draw the line in a way that leaves the Fifth Amendment at the mercy of police discretion.

### A. The Hallmarks of a Non–Custodial Seizure

To understand where the majority's analysis goes awry requires a careful understanding of the relationship between *Miranda* and the more recent case of *Berkemer v. McCarty*, 468 U.S. at 420, 104 S.Ct. at 3138. The majority treats the questioning of Ms. Bengivenga as an ordinary traffic stop. In *Berkemer*, the Supreme Court noted, as we have already, that:

**2.** *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) (traffic stop); *United States v. Gonzales*, 842 F.2d 748 (5th Cir. 1988) (airline ticket).

Two features of an ordinary traffic stop mitigate the danger that a person questioned will be induced to speak where he would not otherwise do so freely.... First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief. The vast majority of roadside detentions last only a few minutes.... In this respect, questioning incident to an ordinary traffic stop is quite different from stationhouse interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides the interrogators the answers they seek.

Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police.... Most importantly, the typical traffic stop is public.... Passersby, on foot or in other cars witness the interaction of the officer and motorist. This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subject to abuse.

*Id.* at 437–39, 104 S.Ct. at 3149.

The Court was particularly concerned that if these two factors should evaporate the traffic stop would lose its non-custodial character. Otherwise, traffic stops "might open the way to widespread abuse. Policemen [might] simply delay formally arresting detained motorists, and ... subject them to sustained and intimidating interrogation at the site of their initial detention." *Id.* at 440, 104 S.Ct. at 3150. To prevent this, the court emphasized that "If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protection prescribed by *Miranda.*" *Id.* The Court specifically eschewed a per se rule that traffic stops are non-custodial, and pointed out that, "police and lower courts will continue occasionally to have difficulty deciding when a suspect has been taken into custody." *Id.* at 441, 104 S.Ct. at 3151.

## B. A Non–Custodial Seizure With All the Hallmarks of Custody?

The majority takes great pains to demonstrate that this particular border stop was both public and brief. I cannot agree. The *Berkemer* Court pointed out that when a traffic stop takes place on the street, the presence of passersby guards against actual police misbehavior and undercuts the police dominated environment. This characteristic of a traffic stop disappeared as soon as Ms. Bengivenga was escorted to the trailer. Ms. Bengivenga was isolated from view of her fellow travelers on the bus and from other travelers who might pass through the checkpoint. It was midnight, and if the bus left, she would be left in an unfamiliar place at least till morning. Granted, she was not taken into an interrogation room, and the bus driver was present when Ms. Bengivenga produced the ticket. Still, the questioning in the trailer was in no way akin in its public character to questioning, on a public thoroughfare open to the plain view of all who should happen to pass by. Furthermore, Ms. Bengivenga was not driving her own car, nor was she capable of leaving under her own power at the close of questioning.

The majority also argues that this interrogation took only a minute and a half, and was therefore brief. To rely upon a stopwatch to make this sensitive and subtle determination is not the correct approach. The phrase used by the Supreme Court in *Berkemer,* was "presumptively temporary and brief." *Berkemer,* 468 U.S. at 437, 104 S.Ct. at 3149. I cannot see how the fact that it only took ninety seconds for Ms. Bengivenga to produce incriminating evidence after being brought to the trailer suggests that a reasonable person once brought to a checkpoint trailer would expect brief detention. Although the actual length of questioning is relevant to whether Ms. Bengivenga's will was actually overborn, it has no relevance to the inherent coerciveness of the situation. Indeed, it may indicate just how coercive the situation was. The Constitution does not give police officers a free minute and a half to

do whatever they wish. As the Court pointed out in both *Berkemer* and *Miranda*, the coercion of custodial interrogation comes not from the actual length of the interrogation, but from a recognition that the police will hold a suspect until they get answers to their questions. 468 U.S. at 438, 104 S.Ct. at 3149; 384 U.S. at 451, 86 S.Ct. at 1615–16.

The majority notes that citizenship checks, even once the individual is moved to a secondary checkpoint, take, on the average, three and a half minutes. They make, however, the unwarranted further assumption that the same presumption of brevity applies to border searches for drugs. Unlike a citizenship check, which is necessarily brief, either the individual can prove citizenship, or he cannot, a drug related detention may take much longer, even in the absence of probable cause. At the time of this case, plenary border searches were allowed in this Circuit,[3] and the Supreme Court has held that extended detention at the border without sanitary facilities is permissible when based on reasonable suspicion of drug smuggling. *United States v. Montoya de Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) (sixteen hours). *See also, United States v. Oyekan*, 786 F.2d 832, 833–34, 836 (8th Cir.1986) (four hours). A reasonable, though innocent, person in Ms. Bengivenga's position could therefore have feared that her stay in the checkpoint trailer would last quite a long time.

For these reasons, I believe that the character of the questioning changed as soon as Ms. Bengivenga was moved from the area outside the bus to the checkpoint trailer. At that point the questioning was no longer public, and there was the prospect of extended interrogation. The majority's analysis takes a long first step toward allowing police officers to blur the line, between a brief traffic stop and custodial detention, that was central to the Court's opinion in *Berkemer*.

I also object for another reason. By declaring this search non-custodial, the majority misses an opportunity to clarify the law. Every police officer must determine for himself when a traffic stop becomes custodial. The burden is always on the police to show that evidence is admissible and that a confession is voluntary. However, *Berkemer* tells us that so long as the stop is on the street, and short, it is presumptively non-custodial. To my mind, that presumption ends as soon as the suspect is removed from the public thoroughfare to a squad car, checkpoint trailer or station house. To reestablish a presumption of voluntariness, the police must inform the suspect of his rights, or of the fact that he is not under arrest.[4]

The majority, however, leaves it unclear what factors are dispositive in this case. Does entering the trailer matter at all? Is the presence of the bus driver in the trailer dispositive? I would simplify matters and hold that when a suspect is moved to a secondary checkpoint on suspicion of drug smuggling (as distinct from a citizenship check), he or she is in custody and should be informed of his or her rights. Even if one does not adopt such a per se rule, I believe that Ms. Bengivenga, purely on the facts of this case, was in custody.[5]

---

**3.** *United States v. Jackson*, 825 F.2d 853, 860–62 (5th Cir.1987) (en banc), *cert. denied sub nom., Ryan v. United States*, — U.S. —, 108 S.Ct. 711, 98 L.Ed.2d 661, *cert. denied sub nom., Browning v. United States*, — U.S. —, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988).

**4.** *This position does not conflict with either Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), or *California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). Both of these cases deal with station house questioning, where the suspect voluntarily agreed to accompany officers to the police station. In both cases, the suspect was specifically informed that he was not under arrest, and

in both cases the suspects actually did leave the station house within half an hour. 429 U.S. at 492, 494, 97 S.Ct. at 711, 713; 463 U.S. at 1122, 103 S.Ct. at 3518.

**5.** The Ninth Circuit applies an objective standard as well, but they have articulated some of the factors which contribute to an objectively reasonable belief that custody has begun. They examine four factors: 1) the officer's language in summoning the suspect; 2) the physical surroundings of interrogation; 3) the extent to which the accused is confronted with evidence of his guilt; and 4) the amount of pressure exerted. Applying this standard, the Ninth Circuit has held that the objective circumstances

## III. TESTIMONY?

Because the majority finds that Ms. Bengivenga was not in custody, they needed go no further to affirm the conviction. Still, they reach out to redefine testimony to exclude the production of baggage stubs. In so doing they misread the primary case they cite for support. The majority argues that production of the ticket was non-testimonial, because all passengers carry tickets. In so doing, they focus on the content of the requested papers. This is completely inconsistent with the approach adopted in *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), and followed in *United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984).

*Fisher* rejected the approach followed in *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), which focussed on the content of a requested document. *Fisher* held that the Fifth Amendment applies only to the act of production. The issue is whether the act of producing a document conveys sufficient information to be considered testimonial. The Court said:

> The act of producing evidence in response to a subpoena nevertheless has communicative aspects of its own, wholly aside from the content of the papers produced. Compliance with the subpoena tacitly concedes the existence of the papers demanded and their possession or control by the taxpayer. It also would indicate the taxpayer's belief that the papers are those described in the subpoena.... The elements of compulsion are clearly present but the more difficult issues are whether the tacit averment of the taxpayer are both "testimonial" and "incriminating" for purposes of applying the Fifth Amendment. These questions perhaps do not lend themselves to categorical answers; their resolution may instead depend on the facts and circumstances of particular cases.

surrounding a customs inspection were sufficient to constitute custody, where the suspect was confronted with evidence of illegally imported merchandise and was not told that she was free to leave. *United States v. Estrada–Lucas*, 651 F.2d 1261, 1266 (9th Cir.1980).

*Id.* 425 U.S. at 410, 96 S.Ct. at 1581. In *Fisher* the existence, possession and control of the requested documents were not an issue. Production of the documents conveyed no information in and of itself. However, the Court stated that an act of production that did convey information would be testimonial.

This approach was followed in *United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984), where the district court held that requiring defendant to produce the business records of a sole proprietorship would force him to admit that the documents existed, that they were in his possession and that they were authentic. The Supreme Court concluded that defendant could not be compelled to produce those records.

This case is indistinguishable from *Doe*. The police knew that the seized luggage contained drugs, but they needed something to link them to Ms. Bengivenga. Baggage stubs alone do not suffice to link a person to a bag. The baggage stubs must be in possession of the suspect to convey any information at all. Where as here, the physical evidence would be meaningless without the physical act of production, that act must be deemed testimonial.

The majority further attempts to distinguish production of the ticket from production of the ticket stubs. Without doubt, production of the ticket itself was testimonial, as defined in *Fisher*. The agent requested the ticket and Ms. Bengivenga produced it. Possession of a ticket to Alice confirmed that Ms. Bengivenga was indeed going to Alice, the destination of the marijuana laden suitcases. In the ticket envelope were baggage stubs that linked Ms. Bengivenga to the suitcases. The majority's focus on the content of the documents produced causes them to mistakenly treat the stubs as a fruit of the tainted testimony rather than as the testimony itself. The act of production of the ticket envelope

*Estrada-Lucas* suggests that, at least in the Ninth Circuit, the context surrounding the questioning of Ms. Bengivenga would have been held to constitute custody under an objective standard.

which contained both the stubs and the ticket was the testimony. It makes no difference that one testimonial act produced two pieces of paper, when the pieces of paper are meaningless if the testimonial act is suppressed.

\* \* \* \* \* \*

It is, therefore, with great regret that I dissent from the majority opinion, the author of which has earned, over the years, my respect for both his analysis and judgment. In this case, however, I am forced to conclude that a reasonable person, in Ms. Bengivenga's position, would have felt compelled to answer any questions put to her by the officers, unless apprised in advance of her constitutional rights, and that the act of producing the ticket and baggage stubs conveyed enough information to be deemed testimonial.

On this rationale I would reverse Ms. Bengivenga's conviction.