BUNTON, District Judge,
dissenting:
I must respectfully dissent from the majority’s conclusion that Eddie Franklin Douglas was not “in custody” when he made statements regarding the presence of firearms in his residence during the January 28, 1992, search. The Fifth Amendment provides an accused the right against compulsory self-incrimination. Miranda warnings are the prophylactic “measures to insure that the right against compulsory self-incrimination is protected.” U.S. v. Smith, 7 F.3d 1164, 1170 (5th Cir.1993) (quoting Duckworth v. Eagan, 492 U.S. 195, 203, 109 S.Ct. 2875, 2880, 106 L.Ed.2d 166 (1989)). Although there is no precise admonition that must be’ given a criminal defendant, our system of criminal justice requires that an accused be givén Miranda warnings, or their functional equivalent before any custodial interrogation.[1] A custodial interrogation results when a person is formally arrested or has a significant restraint imposed on his or her freedom of movement. California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam). Douglas had not been formally arrested at the time he made the incriminating statements. Thus, the focus of the inquiry is whether the officers that executed' the search warrant created an environment where Douglas’ perception of his freedom of movement was restrained to the degree associated with a formal arrest.
When determining whether the restraint on an individual’s movement rises to the level associated with a formal arrest, “the only relevant inquiry is how a reasonable man in the suspect’s position would have understood the situation.” Berkemer v. McCarty, 468
U.S. 420, 442, 104 S.Ct. 3138, 3141, 82 L.Ed.2d 317 (1984). This reasonable person is one that is “neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances.” United States v. Bengivenga, 845 F.2d 593, 596 (5th Cir.1988) (en banc). The awareness that the officers have probable cause to arrest or realizing that oiie has become the “focal point” of an investigation is relevant to the custody analysis when such awareness would lead a reasonable person to conclude that he was not free to leave. Id. at 597 n. 16.
Several other factors are appropriate to consider when applying the “reasonable person test.” First, the length of the detention is relevant for determining whether a reasonable person would believe that his freedom is restrained to the degree associated with a formal arrest. Bengivenga, 845 F.2d at 598. A stop that is temporary and brief, such as a traffic stop, would not induce the reasonable person to the believe that he or she would be subjected to a significant restraint of his or her freedom of movement.
Second, the location of the detention and interrogation is pertinent. Id. Whether the questioning occurs in a public rather than private place mitigates the fear that a reasonable person may have of police overbearance or abuse. See id. The fact that the detention occurs under the scrutiny of other citizens reduces the individual’s perception of the degree of restraint. Also relevant to this inquiry is the police presence — or the number of officers involved. One or two police officers’ presence reduces a person’s sense of vulnerability whereas a greater number increases a person’s apprehension. See id. *1332 (citing Berkemer, 468 U.S. at 438, 104 S.Ct. at 3149).
And finally, the totality of the circumstances surrounding the detention and interrogation which tend to add or subtract from the subjective fear or surprise that a reasonable person would experience is pertinent. See id. at 599. I recognize that for the safety of both the agents, occupants and to prevent the destruction of evidence, surprise is an essential element in executing a search warrant of this kind. However, the manner in which this search warrant was executed served to increase the surprise and perceived threat pf police overbearance and abuse. This impacts on the apprehension a reasonable person would feel during questioning by Federal Agents and whether or not that person would believe that he or she was free to leave.
Applying these factors to the case at bar, I believe that Eddie Franklin Douglas was “in custody” at the time he made the statements concerning the existence of firearms in the house, and that it was clearly erroneous for the trial court to deny Douglas’ Motion to Suppress.
1. Probable Cause to Arrest or Knowledge that Individual is Focal Point of Investigation
At the time Douglas responded to the officer’s questions about the firearms, Douglas knew that he was an ex-felon and that he had guns in the house. Hence, when Special Agent David McIntosh told Douglas that he would be arrested if he was a felon and had weapons in the house, Douglas knew that he was not free to leave. See ROA Vol. 36 at 43, 48. A reasonable person, knowing that the police have ample cause to arrest him and that he is the “focal point” of the investigation would not feel free to leave. This was Douglas’ situation. Furthermore, the fact that the agents knew that Douglas was a felon combined with Douglas’ statement that there were weapons in the house raises the inference that the officers treated Douglas as they would treat a person that they had probable cause to arrest (i.e., the agents would not have allowed the individual to leave).[2]
. II. Length of Detention
The search warrant was executed at 7:30 a.m. Douglas was eventually arrested and first Mirandized between 3 and 4 p.m. when the United States Attorney made the decision to detain Douglas. ROA Vol. 36 at 68. The Government argues that Douglas was not in custody during this time. However, several Special Agents testified that it is the F.B.I.’s policy and practice to detain an individual until the United States Attorney makes the decision to permanently detain a person if he has a felony conviction and is found in possession of a firearm.[3]
*1333 During the search, a Mansfield, Texas police officer was assigned to stay with Douglas and the family members. ROA Vol. 36 at 76. When Douglas needed to go to the bathroom later in the day, he was escorted into the residence by two officers. Id. Likewise, when Douglas asked if he was free to leave, Agent McIntosh related to Douglas that he preferred that he remain. Id. at 53. Given this mass of evidence, I conclude that Douglas’ length of detention lasted from 7:30 a.m. to the time of his arrest between 3 and 4 p.m.
III. Location of Detention
The search and subsequent detention was not carried out under the scrutiny of other citizens. During the suppression hearing, testimony indicated that the Agents blocked the entrances and exits to the neighborhood where the residence was located. Id. at 78. Law enforcement personnel were the only ones that witnessed the treatment afforded to Douglas. Furthermore, between twenty and fifty agents clothed in black body armor, masks, helmets, combat boots and armed with semi-automatic rifles and handguns executed the search warrant and remained at the residence during a portion of the search after the residence was secured.
Needless to say, the police presence was significantly greater than that associated with a routine traffic stop and was not witnessed by other citizens as are brief stops at fixed border checkpoints. In fact, the only persons that were around Douglas during the majority of the search were Federal Law Enforcement Agents. The number of officers which were present during the period numbered between twenty and fifty. This police presence was significant and served to increase Douglas’ perception of restraint on his freedom of movement.
Similarly, the interrogation at issue occurred at Douglas’ residence was not in the nature of a brief investigatory visit as when an officer drops by to inquire into a neighbor’s complaint. Hence, the fact that the interrogation occurred in Douglas’ residence is of little consequence in mitigating his fear of police overbearance or abuse.
IV. Other Factors Creating a Subjective Fear
Likewise, a reasonable person, after witnessing federal agents dressed in tactical gear, crashing through the electronic gate across the driveway, attempting to rip the burglar bars off the residence with a tactical vehicle and exploding concussion devices in the yard would have felt that the restraint on his freedom of movement was to the degree that is associated with a formal arrest.
When Douglas was initially brought out of the house, he was unclothed from the waist down. The agents forced him onto the driveway facedown and kept him there at gunpoint for several minutes. The agents did not cover Douglas’ naked body, nor allow him to have clothing for a period of time which was significant under the circumstances. Being unclothed, face down on the driveway and held at gunpoint in front of both male and female federal agents would certainly increase a reasonable person’s subjective fear and is a degree of restraint associated with a formal arrest.
In light of the specific facts surrounding the execution of this search warrant, I believe that the trial court erred in failing to suppress Douglas’ statements centering on the existence of weapons in his residence. Because the agents’ custodial interrogation of Defendant violated his Fifth Amendment right against self-incrimination, and some of the guns were the fruit of the poisonous tree, I would also suppress the guns that were found as the result of Douglas’s statements and vacate Douglas’ conviction on Count 18 (Felon in Possession of a Firearm). I dissent with my colleagues on this issue, but concur with the remainder of the majority’s opinion.

. Miranda warnings are not rights, in and of themselves, protected by the Constitution. However, the utter failure to notify an accused of his rights enunciated in Miranda may lead to a violation of a right protected by the Constitution (e.g., compulsory self-incrimination).

. The F.B.I.'s affidavit for search warrant states “EDDIE FRANKLIN DOUGLAS has felony narcotics convictions in 1973 and 1979. He is on Texas state parole for Life [sic].” Tr. at 622. Aff. of G. Maberry at 14. Similarly, Special Agent L. Steve PoweE testified that before the Special Weapons and Tactics Team executed the search warrant, agents "had been informed that Mr. Eddie Douglas would be in that residence and that, previously, he had been convicted of an assault and an attempt to kill a police officer.” ROA Vol. 36 at 9-10. Powell further stated that "we were also aware of the fact that more recently he had been arrested for being an ex-felon in possession of a firearm." Id. at 10.
Special Agent Carlos Ortiz also testified .that he was aware that Douglas was a convicted felon before he entered the residence at the time of the search. Id. at 35.
Special Agent David McIntosh testified that he knew Douglas had a felony record when he told Douglas that he would be arrested if he had a record or if you "got [sic] an Elegal weapon.” Id. at 48-50. In fact, McIntosh stated that every agent participating in the search had been advised that Douglas was a convicted felon. Id. at 49.
One of the interrogating officers even testified that he understood that asking Douglas questions about his relationship or control over the premises were questions that could be incriminating. Id. at 60. Although aware of the incriminating ‘ nature that Douglas' answers could possess, the agent still did not Mirandize Douglas. Id. at 76.

. Special Agent Ortiz testified that he would have maintained control over Douglas untE the United States Attorney made the decision to arrest him because Ortiz knew that Douglas was a convicted felon, and he also knew that firearms had been found in the residence. See ROA Vol. 36 at 39.
Special Agent Mike Morgan testified that it is the F.B.I.’s normal procedure to detain a person who they beheve to be a convicted felon and in possession of a firearm until the United States *1333 Attorney determines what action to take. See ROA Vol. 36 at 68.