399 So.2d 1161 (1981)
STATE of Louisiana
v.
Clyde N. THOMPSON, Charles M. Hubbs and Colvin L. Wines.
No. 80-K-2521.
Supreme Court of Louisiana.
May 18, 1981.
Rehearing Denied July 2, 1981.
Dissenting Opinion July 21, 1981.
*1164 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Lindsay Larson, Louise S. Korns, and J. Kevin McNary, Asst. Dist. Attys., for relator-applicant.
Richard B. Stricks and Bernard Bagert, of Bagert, Bagert & McDonald, New Orleans, for defendants-respondents.
Dissenting Opinion July 21, 1981. See 400 So.2d 1080.
MARVIN, Justice Ad Hoc.[*]
Writs were granted by this court to review the correctness of the trial court's suppression of an alleged inculpatory statement made by the defendant Thompson to a police officer without Thompson being advised of the right to counsel afforded him by Art. 1, § 13, La.Constn. and by Miranda. We find the alleged statement was made in a non-custodial situation and reverse.
The issue concerns whether an inculpatory statement was made as a response to police interrogation while Thompson was in custody or was significantly detained. State v. Menne, 380 So.2d 14 (La.1980); Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).
The record states Policeman Hughes' summary of the conversation which took place in the presence of the victim, the three defendants, and two other police officers in the lobby of a small New Orleans motel, but does not recite details of the conversation. The defendants were Thompson, Wines, and Hubbs.
Officer Hughes testified:
"I was having ... coffee ... at ... [a] donut shop and was approached by the complainant [Schoen] who alleged he had been the victim of a battery committed upon him by several persons ... I returned with him to the parking lot of the [motel] ... where ... Wines was standing... We discussed the altercation with him ... The course of the inquiry took us into the lobby ... and ... the elevator door opened and ... Thompson and ... Hubbs came out of the elevator. Wines ... came in with me and the victim or complainant was walking through the front door with [the other officers.] [Schoen identified Thompson as a perpetrator when the door opened.] I noted what appeared to be some blood spatters or spots on ... Thompson's shirt. I asked him who he was, he identified himself to me, the other subjects identified themselves, and I asked Thompson how he came by the blood spots on his shirt and apparently looking over my shoulder at the victim who entered the lobby he said an incident had occurred between them at another location as he was located in the parking lot and they assaulted him without any provocation.
"Who?
"Wines and Hubbs.
"Did he make any other statements to you?
"There was a general discussion at the time about who they all were."
Apparently the trial court concluded that Hughes said that Thompson said "... an incident had occurred between them [Thompson, Wines, and Hubbs, on the one hand, and Schoen, on the other] ... and they [Wines and Hubbs] assaulted him [Schoen] without any provocation," for it is only in this sense that the statement is inculpatory of any defendant. The quoted testimony obviously is subject to other reasonable interpretations.[1]
*1165 Only Hughes and Schoen testified at the suppression hearing. Schoen testified that Officer Hughes first asked Thompson when Thompson stepped out of the elevator, "May I see you for a moment?" Schoen said that he did not hear all of the details of the Hughes-Thompson conversation and Schoen was not asked what else he heard.
Defendants were not arrested or physically detained during or after the conversation, but were given a summons to appear in municipal court apparently on the authority of CCrP 211. Defendants made no move or attempt to leave the motel lobby while the police officers were there. A bill of information was later filed against the defendants charging them with second degree battery, a felony, under LRS 14:34.1.
In Menne, this court held that our constitution, by providing in Art. 1, § 13, that a person who is detained in the connection with the investigation of any offense must be fully advised of his rights, requires "that investigating officers give the warnings anytime such a citizen is deprived of his liberty in a significant way or was not free to go as he pleases." 380 So.2d at p. 17. Emphasis supplied.
The determination of whether the detention is significant is to be made objectively from the totality of the circumstances. Menne, supra. Factors relevant to the determination include (1) whether the police officer had reasonable cause under C.Cr.P. 213(3) to arrest the interrogee without a warrant; (2) the focus of the investigation on the interrogee; (3) the intent of the police officer, determined subjectively; and (4) the belief of the interrogee that he was being detained, determined objectively. Whether or not there is a custodial interrogation under federal terminology or a significant detention under Louisiana terminology must be determined on a case-by-case basis. State v. Ned, 326 So.2d 477, 479 (La.1976).
The conversation in the motel lobby was described as "brief" and was prefaced by the apparent request, "May I see you for a moment?" Officer Hughes testified that he did not consider the defendants were in a custodial situation but that they were "... not free [to leave] until he concluded the business [of the investigation]." In response to the hypothetical what-if question, Hughes speculated that "... had [defendants] said [they] were going to leave ... I would have reassessed what to do ... I believe I would have said you will have to be arrested, I have to take action."
Hughes had alternative courses of action. Under CCrP 213(3) he had the discretionary authority to arrest Thompson without a warrant (may arrest with reasonable cause). Under CCrP 215.1 he had the discretionary authority to stop Thompson and ask him to explain his circumstances (actions) and to identify himself (may do this upon reasonable suspicion that that person has committed an offense). Hughes' initial assessment of Schoen's story caused Hughes not to choose to arrest under 213, but to inquire under 215.1(A):
"A law enforcement officer may stop any person in a public place whom he reasonably suspects ... has committed ... a felony or a misdemeanor and may demand of him his name, address and an explanation of his actions." Emphasis supplied.
Hughes asked Thompson to identify himself and, in effect, to explain his apparent actions (the circumstance of apparent blood on Thompson's shirt). After that inquiry, Hughes did not further interrogate Thompson, did not decide to arrest Thompson, but instead, to issue him a municipal court summons under CCrP 211, which may be issued when it is lawful to arrest without a warrant for a misdemeanor. It is apparent that Hughes determined to exercise and act upon probable cause to arrest without a warrant by issuing the summons after the conversation in the lobby.
*1166 This court observed in State v. Weeks, 345 So.2d 26, 28 (1977) that
"... Miranda warnings are not a prerequisite to the admissibility of statements taken by officers during non-custodial, general, on-the-scene investigations, conducted to determine the facts and circumstances surrounding a possible crime, absent a showing that the investigation has passed the investigatory stage and has focused on the accused. See also State v. Anderson, 332 So.2d 452 (La.1976); State v. Ned, 326 So.2d 477 (La.1976); State v. Roach, 322 So.2d 222 (La.1975)."
Similarly, this court has held that a general investigatory and pre-custodial inquiry at the home of a defendant does not require Miranda warnings. State v. Hodges, 349 So.2d 250, 257 (La.1977). In Anderson, supra, a deputy sheriff had been told of Anderson's involvement in a homicide at Soileau's Grocery. The deputy knew Anderson and went from the grocery to Anderson's home where he advised Anderson only of his right to remain silent. The Deputy then asked, "What happened at Soileau's place?" Anderson's answer, that he had intended to shoot Williams and had not intended to shoot the female victim, was held admissible as a non-custodial response.
A motel is more analogous to one's home than is a courthouse or police station. Compare State v. Ned, supra. In this instance, the parking lot of the motel was the scene of the alleged battery. Hughes' inquiry (who are you, how did you get blood on your shirt?) was interrogative but was not reasonably likely to elicit an incriminating response, if indeed Thompson's response, as summarized by Officer Hughes in the quote above, is considered incriminating. Innis, supra, 100 S.Ct. at p. 1689. Sometimes what appears to be blood turns out to be another substance. It is also not unlikely that a person suspected of a battery, who himself is somewhat bloody, will explain that he is the victim of another's battery, a good Samaritan, or perhaps has been accidentally bloodied.
"... [A] non-custodial situation is not converted to one in which Miranda applies simply because a ... court concludes that, even in the absence of any ... restraint on freedom of movement, the questioning took place in a `coercive environment.' Any interview of a person suspected of a crime will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned suspect is the one whom the police suspect. Miranda warnings are required only when there has been such a restriction of a person's freedom as to render him `in custody.' It was that sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited." Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977). On the other hand, the U.S. Supreme Court has said that the Miranda principle should apply to questioning that takes place in a suspect's home after he has been arrested and is no longer free to go where he pleases. Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969).
In State v. Collins, 370 So.2d 533 (La. 1979), the police learned that Collins, while wearing pink pants and a flowered shirt, had departed a grocery store with a 13-year-old girl who was later determined to have been the victim of a sexual assault and homicide. When police found Collins at a neighbor's home and noticed he was dressed in different colored clothing, they asked him if he had worn different clothing earlier in the day. When Collins replied that he had worn different clothing earlier that day, the police immediately gave him the required Miranda warnings and later arrested him after finding the pink pants and the flowered shirt in the home. This court, observing that the question whether the officers began custodial interrogation before the initial Miranda warnings was a "close one," stated:

*1167 "The defendant was standing outside his friend's house ... He was not threatened with any physical restraint. The officers' preliminary questions as to his previous whereabouts and apparel did not necessarily indicate that defendant was under suspicion or that he would be prevented from leaving ... Under the circumstances, the officers were entitled to learn if in fact the defendant was the person in pink flowered apparel who was at the store at the time in question ... When the defendant confirmed that he was present during the time ... but gave information controverting that of other witnesses as to the description of his clothing, the officers immediately advised him of his constitutional rights ... Accordingly, defendant was not subjected to custodial interrogation without being informed of his constitutional rights." 370 So.2d at p. 538. See also annotation, "Custodial InterrogationMiranda Rule, 31 A.L.R.3d 565.
Whether a person has been significantly detained so as to mandate the advice of rights is a question which must be judicially determined, objectively and in retrospect, in the light of all of the circumstances of the particular case (Menne, Ned, supra). No one factor, such as time, place, type of question, police intent, suspect belief, focus of investigation, probable cause to arrest without a warrant, will solely control every determination. The strength of cause for arrest will vary with the magnitude of the intrusion and with the alternatives available to the policeman. State v. Billiot, 370 So.2d 539, 543 (La.1979). Similarly the legal character of the detention varies with the alternatives available to the policeman and with the restraint actually imposed by either or both the policeman's words or actions. See C.Cr.P. 201.
If Hughes had reasonable cause to arrest Thompson without a warrant, Hughes chose not to exercise this discretionary authority under CCrP 213. If Hughes had reasonable cause under CCrP 213, he also had the lesser "reasonable suspicion" under CCrP 215.1 to stop Thompson in a public place and demand that Thompson explain how he had the apparent blood on his shirt. This stop and demand or inquiry was prefaced by a request (May I see you for a moment?) and was generally an investigatory inquiry under CCrP 215.1. Even if this stop is a detention under Art. 1, § 13 of the Constitution, it was not an inquiry reasonably likely to elicit an incriminating response.[2]
Under these circumstances, we hold that the stop or detention was not a significant detention mandating the constitutional advice. The circumstances do not indicate that Thompson was deprived of his freedom or was detained in any significant way. Menne, supra at p. 15.
The rules governing admissibility of confessions apply as well to the admissibility of inculpatory statements. State v. McGraw, 366 So.2d 1278 (La.1978). This court has observed that the question of admissibility in such cases is, in the first instance, a question for the trial judge whose conclusions on credibility and weight of testimony pertaining to voluntariness will not be overturned unless they are not supported by evidence. State v. Matthews, 354 So.2d 552 (La.1978). In this instance we have no credibility issues where only Officer Hughes and the alleged victim offered testimony and the trial judge based his ruling solely upon the legal effect of the circumstances which were revealed by the testimony. In such cases this court must exercise its responsibility and make the ultimate determination that the statement or confession is or is not legally admissible. See State v. Payne, 338 So.2d 682 (La.1976); State v. Peters, 315 So.2d 678 (La.1975).
Under C.Cr.P. 703 D, the State has the burden of proving the admissibility of a purported confession or statement by the defendant, and particularly that the *1168 confession or statement was made freely and voluntarily. This burden exists on the hearing of a motion to suppress. State v. Johnson, 327 So.2d 388 (La.1976). The record supports the conclusion that the State has met its burden in this respect, and Thompson does not contend otherwise.

MOTION TO DISMISS
Defendants have filed in this court a motion to dismiss this prosecution on the grounds that LRS 14:34.1 is unconstitutionally vague and overbroad and that there is not sufficient evidence of "protracted and obvious disfigurement" or of "protracted loss or impairment of a bodily function". The contention that there is not sufficient evidence of an element of the crime is premature. No evidence has been adduced, no trial has been had, and no verdict has been rendered. Analogizing this motion for dismissal to a motion to quash, we conclude that questions of factual guilt or innocence of the offense charged are not properly raised by such a pre-trial motion. See State v. Atkins, 360 So.2d 1341 (La.1978) and State v. Marcal, 388 So.2d 656 (La.1980). The merit (or lack of) the State's case is not a proper basis for a motion to quash. Marcal, supra. This basis for dismissal is without merit.
Defendants argue that L.R.S. 14:34.1 is unconstitutional because it allows a victim's subjective perception of "extreme physical pain" to be determinative of a crime. They further argue that the failure of the statute to define "extreme physical pain" improperly vests the jury with a legislative function. A statute is unconstitutionally vague if men of common intelligence must guess as to its meaning. See State v. Cannon, 383 So.2d 389 (La.1980). The phrase "extreme physical pain" describes a condition which most people of common intelligence can understand. The fact that the term is subjective in nature and susceptible to interpretation does not mean that it is violative of due process or will not necessarily be applied constitutionally. This phrase gives adequate warning of the conduct proscribed and provides a workable standard for judges and juries to fairly administer the law. See Cannon, supra; Boyce Motor Lines, Inc. v. United States, 432 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367 (1952); State v. McCoy, 395 So.2d 319 (La.1980).

CONCLUSION
Defendants' motion to dismiss is denied. The sustaining of the motion to suppress is overruled and the case is remanded for further proceedings.
LEMMON, Justice concurring in denial of rehearing and assigning reasons.
On application for rehearing defendant persuasively argues that since the officer's question as to how the blood got on defendant Thompson's shirt was reasonably likely to elicit an incriminating response, the Innis rationale is not applicable. Nevertheless, the overall circumstances do not establish the type of custodial setting to which Miranda was intended to apply. The setting in this case cannot reasonably be viewed as coercing defendant into making an involuntary statement which was not likely to be reliable.
NOTES
[*] Judges Pike Hall, Jr., Charles A. Marvin, and Jasper E. Jones, of the Court of Appeal, Second Circuit, participated in this decision as associate justices ad hoc, joined by Associate Justices Pascal F. Calogero, Jr., James L. Dennis, Fred A. Blanche, Jr., and Harry T. Lemmon.
[1] The State answered defendants' motion for discovery [of statements made by defendants] that

"The defendant Thompson stated that he and Wines and Hubbs beat the victim, although unprovoked because Thompson saw the victim with his girlfriend. This statement was made on August 1, 1980, at approximately 3:00 a. m. in the 3600 block of St. Charles Avenue to Police Lt. John Hughes and Police Lt. C. Bankston. The defendant Hubbs stated that he just tried to separate Thompson and the victim during the altercation. The defendant Wines had no comment."
[2] Any inquiry or remark made by the police to a person after he is in custody will be deemed the equivalent of custodial interrogation where it is shown that the police inquiry or remark is reasonably likely to elicit an incriminating response. Innis, supra.