706 So.2d 530 (1997)
STATE of Louisiana
v.
Paula HAMMOND, et al.
No. 97-K-1677.
Court of Appeal of Louisiana, Fourth Circuit.
December 30, 1997.
*531 Harry F. Connick, District Attorney, Suzanne Dickey, Assistant District Attorney of Orleans Parish, New Orleans, for Relator.
Dominick Savona, Jr., Gretna, for Respondent Paula Hammond.
Adam S. Cohen, New Orleans, for Respondent Sidney Lacour.
Before ARMSTRONG, LANDRIEU and MURRAY, JJ.
LANDRIEU, Judge.
The application for supervisory writs submitted by relator, the State of Louisiana, is granted. The July 18, 1997 ruling of the trial court, suppressing the statements made by the defendants to the state legislative auditors on what appears to be constitutional grounds, is reversed. The matter is remanded, however, for consideration of the statements under La.Rev.Stat. 15:451.
The state charged defendants, Paula Hammond, Sidney Lacour, and Lori Price, with theft of five hundred dollars or more belonging to the State of Louisiana. Defendants were toll collectors on the Crescent City Connection, and the state alleged that they had pocketed toll money for their own use. All three defendants pleaded not guilty. Hammond and Lacour filed pretrial motions to suppress their statements. Following a hearing, the trial court suppressed the statements, finding that the defendants were subjected to "custodial questioning" by state legislative auditors and thus should have been advised of their Miranda rights.
Calvin Moore testified that he is employed as an auditor with the state legislative auditors office and that his unit conducts investigations to determine if state funds have been spent appropriately. He said that his office received information that toll funds were being misappropriated from the Crescent City Connection. The office initiated an investigation using a statistical analysis of the toll collectors to find out the average amount of tolls collected versus non-revenue transactions. The investigation indicated that the defendants were recording revenue transactions as non-revenue transactions such that when a toll paying vehicle entered the toll booth, the defendants would record the transaction as a non-toll transaction and pocket the money. From an observation area on the bridge, Moore and other auditors used binoculars to observe vehicles pass through the defendants' toll booths. A monitor inside the observation area recorded whether the defendants pushed a revenue or non-revenue key to record the type of transaction that came through the toll booth.
According to Moore, following the investigation, the defendants were called in for an interview at their place of employment. The interviews were taped and were conducted by Moore, Ernie Levy, and Berrel Pattin. During the interviews, all three defendants admitted to misclassifying the transactions and pocketing the money. Sidney Lacour admitted to taking about twenty dollars per shift. She worked six shifts per week. Paula Hammond admitted to taking as much as fifty dollars per shift beginning in August 1994; she offered $2000.00 in restitution. Lori Price admitted to taking as much as thirty dollars in a given shift. The estimated amount that she took was approximately $3000.00. Moore testified that he is not a law enforcement officer. He also stated that he did not threaten the defendants in any way and that they were free to leave.
Moore was cross-examined by defense counsel for each defendant. When questioned by Lacour's counsel, Moore stated that he had personally observed Lacour from the observation area more than once. His observations were not video recorded, but were recorded in writing. He stated that Lacour was one of the high recorders of non-revenue vehicles, although she was not considered a suspect. However, he did admit *532 that he believed that she may have been involved in some kind of criminal activity. Moore said that he did not call the police because their normal procedure is to interview the individual and document the interview. He stated that when the defendants were called into the office, they were informed that they had been observed misclassifying transactions. They were asked why they did this and what did they do with the money. Moore stated that initially none of the defendants admitted that they took the money. However, as the interviews progressed, they all admitted their guilt. Moore stated that Lacour's interview lasted about three to three and one-half hours. The other two interviews lasted about one to one and one-half hours. Price and Hammond admitted their guilt sooner than Lacour. Moore did not indicate to the defendants that they did not have to give a statement or that they had a right to an attorney before he interviewed them because, he said, he is not a law enforcement officer. Moore admitted that, once it was established that a theft had occurred, the report is given to the district attorney for prosecution. Moore testified that all three defendants refused to sign a written statement.
When questioned by Price's counsel, Moore stated that he personally observed Price record revenue transactions as non-revenue transactions. He stated that Ernie Levy, another state auditor, was present at Price's interview. Although he did not demand that she stay, Moore said he did not remember telling Price that she could leave, but she could have left at any time.
When questioned by counsel for Hammond, Moore stated that Hammond was called in because of information received from an informant. He admitted that he had never used this informant before and never investigated his credibility. Berrel Pattin was present at the first interview of Hammond, Ernie Levy was present at the second one.
On re-direct examination, Moore testified that all three defendants were free to leave during the interviews. The purpose of the interviews was to determine if misclassification of these transactions resulted in state funds being taken.
On re-cross-examination, Moore once again stated that the defendants were free to leave at any time.
Ernie Levy was called to testify by the defense. He stated that he was present at the interviews with Lacour, Price, and Hammond. He personally observed Lacour on her shift, but he could not remember if he personally observed Hammond on her shift.
The trial court granted defendants' motion to suppress at the end of the hearing, finding that the defendants were in custody and should have been given their Miranda rights. The trial court relied upon State v. Martin, 94-252 (La.App. 5th Cir. 10/12/94), 645 So.2d 752, writ denied, 94-2787 (La. 3/10/95), 650 So.2d 1174, and Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), in support of his ruling.
Asserting that the trial court's ruling is erroneous, the state argues that the defendants were not in a custodial setting when they gave their statements, that the legislative auditors were not law enforcement personnel and therefore not required to advise defendants of their Miranda rights before questioning them, and that the defendants' confessions were free and voluntary.
The protections provided by Miranda are not required unless the defendant is the subject of a custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). To determine whether a person was "in custody" for Miranda purposes, the federal Fifth Circuit used a test which examined the following four factors:
1) whether there was probable cause to arrest the defendant;
2) whether the investigation was focused on the defendant at the time of the interrogation;
3) whether the investigator had a subjective intent to hold the defendant; and
4) whether the defendant subjectively believed that his freedom was significantly restricted.
*533 See United States v. Carollo, 507 F.2d 50 (5th Cir.1975). See also State v. Thompson, 399 So.2d 1161 (La.1981) (Louisiana state courts apply four factor test.)
In United States v. Bengivenga, 845 F.2d 593 (5th Cir.1988), the Fifth Circuit held that the four factor test was no longer compatible with current Supreme Court precedent and adopted an alternate analysis. Using language from several Supreme Court decisions, the court in Bengivenga, held that a suspect is "in custody" for Miranda purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree associated with formal arrest. 845 F.2d at 596. The reasonable person, through whom the court must view this situation, must be "a person who is neutral to the purposes of the investigationthat is, neither guilty of criminal conduct and overly apprehensive nor insensitive to the seriousness of the circumstances." Id. The key issue is not what did the defendant think was happening to him when he gave the damaging information, but what would the reasonable person have thought under the same circumstances. United States v. Seguin, 779 F.Supp. 54, 55 (W.D.La.1991).
In Minnesota v. Murphy, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), the United States Supreme Court dealt with the issue of whether incriminating admissions made by the defendant during a meeting with his probation officer were admissible at trial. The defendant had been previously investigated for a rape and murder in 1974 but was not arrested. He was later tried and convicted of a sex offense. The terms of his probation for that offense required him to participate in a treatment program for sex offenders, report to his probation officer regularly, and be truthful in all matters. A counselor at the treatment center told the probation officer that during the course of treatment the defendant admitted to a rape and murder in 1974. Before reporting this to the police, the probation officer arranged for a meeting with the defendant to discuss a treatment plan for the remainder of his probation. At the meeting, the officer told the defendant what she had been told by the counselor. The defendant eventually admitted to the probation officer that he had committed the 1974 crimes. The officer told the defendant that she had a duty to relay the information to the police and that he should turn himself in. The defendant did not and was later arrested and charged with murder.
The defendant challenged the admissibility of his statements to the probation officer on the grounds that the officer should have advised him of his Miranda rights. The Supreme Court reversed the Minnesota Supreme Court's grant of the motion to suppress, concluding that the defendant's privilege against self-incrimination was not violated because he had not been compelled to make the statements. 465 U.S. at 440, 104 S.Ct. at 1149. Further, since the defendant was not in custody at the time he made the statements, he was not subject to an inherently coercive custodial interrogation for which Miranda was designed. 465 U.S. at 433, 104 S.Ct at 1145.
In the instant case, the defendants obviously were not under formal arrest when interviewed. Further, nothing suggests that their freedom of movement was in any way restrained. Although the defendants did not testify at the hearing, the auditors' testimony about the interviews leads us to conclude that a reasonable person, in a similar situation, would not have thought his freedom of movement was restrained. The interviewers were not police officers, and they had no authority to make arrests. Considering the facts in this case, along with the applicable jurisprudence, we find that the defendants were not subject to custodial questioning.
Furthermore, the jurisprudence suggests that Miranda warnings are necessary only when a confession is made to a "state actor." In State v. Martin, the state case upon which the trial judge relied, the defendant worked as a cashier/manager at a convenience store. Her duties included recording sales totals for the previous day into a ledger. The owner hired two security firms to investigate suspected thefts from his store. Investigators came to the store and interviewed employees. During her interview, the defendant admitted she stole $1200. She *534 filed a pretrial motion to suppress her statement, claiming that it was coerced. The defendant claimed to have been interrogated for four hours by one of the investigators. She said that she was not allowed to use the bathroom or telephone and that the investigator threatened her by telling her that her son's application to become a police officer would be jeopardized. The investigator testified that the interview lasted about one and one-half hours. He denied the defendant's other allegations. Although the defendant's statement was found to be admissible because it was voluntary, the court did conclude that if a "state actor" is involved, a defendant must have been advised of his Miranda rights prior to making a statement. 645 So.2d at 754. The court did not define "state actor."
We are not inclined to identify legislative auditors as "state actors." Their duty to investigate, albeit on behalf of the state, does not easily translate to duties of, or in the nature of, law enforcement. In fact, as the state points out, the Supreme Court defined interrogation in Miranda as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. Miranda, 384 U.S. at 444, 86 S.Ct. at 1612. Therefore, even using the unclear concept of "state actor," we do not believe that legislative auditors are persons whose questioning must be preceded by Miranda warnings.
Finally, we come to the issue of voluntariness of the defendants' confessions. Although federal and state jurisprudence is not necessarily in sync on this issue, we begin our analysis with the Supreme Court case that the trial judge relied upon in deciding to suppress the statements in this caseColorado v. Connelly.
Although Colorado v. Connelly is factually dissimilar to the instant case, in that case the Supreme Court held that coercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment. 479 U.S. at 167, 107 S.Ct. at 522. The Supreme Court did refer to "police action" as "state action," particularly in the context of contrasting the actions of a private party seeking to secure evidence against a defendant. 479 U.S. at 165-66, 107 S.Ct. at 521. The Supreme Court also implied that, absent coercive police activity, the admissibility of a confession is determined by state law governing admission of evidence. 479 U.S. at 166-67, 107 S.Ct. at 521.
Hence, having found no coercive police or state action, no custodial questioning, and thus no constitutional violations, we will consider state law on the admissibility of evidence. La.Rev.Stat. 15:451 provides:
Before what [purports][1] to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises.
In State v. Martin, supra, the court held that La.Rev.Stat. 15:451 mandates that all confessions, regardless of whether a state actor is involved, must be proven to be voluntary. 645 So.2d at 754.[2] The state has the ultimate burden of proving beyond a reasonable doubt that a confession was voluntary. State v. Brooks, 92-3331 p. 12 (La.1/17/95), 648 So.2d 366, 373. Courts should look to the "totality of the circumstances" surrounding a confession to determine its voluntariness. State v. Green, supra; see Withrow v. Williams, 507 U.S. 680, 693-94, 113 S.Ct. 1745, 1754, 123 L.Ed.2d 407 (1993) (listing factors relevant to voluntariness inquiry).
Whether a confession is voluntary for the purposes of determining its admissibility *535 is a question to be determined by the trial judge. Because the trial judge's ruling on the voluntariness of a confession is based on conclusions of credibility and weight of testimony, it is entitled to great deference and will not be disturbed on appeal unless there is no evidence to support the ruling. See State v. Bourque, 622 So.2d 198, 222 (La.1993); State v. Martin, 645 So.2d at 754.
In this case, the trial judge did not make a ruling on the voluntariness of the defendants' confessions. Indeed, in ruling that the confessions were inadmissible because auditors as "state actors" subjected the defendants to a "custodial questioning" such that Miranda was circumvented, it was not necessary for the trial judge to go any further. Furthermore, because the instant writ application does not contain the defendants' motion to suppress, we do not know whether the defendants even claimed that their confessions were not freely and voluntarily given. In considering the voluntariness issue, we are also disadvantaged because we have not reviewed, nor were we provided with, the taped interviews.
Accordingly, having concluded that there were no state actors or action involved in this case and that the defendants were not questioned in a custodial setting, we find that the trial judge erred in ruling that the defendants' statements were inadmissible based upon constitutional violations. Nevertheless, we remand the matter to the trial court for a ruling on the voluntariness of the confessions under La.Rev.Stat. 15:451 in accordance with the discussion contained in this opinion.
WRIT APPLICATION GRANTED.
MURRAY, J., dissents with reasons.
MURRAY, Judge, dissenting.
In my view, the trial court correctly determined that the defendants' incriminating statements were inadmissible because they were obtained during a significant detention in connection with the State's investigation of a criminal offense.
Article I, Section 13 of our state Constitution provides as follows:
When any person has been arrested or detained in connection with the investigation or commission of any offense, he shall be advised fully of the reason for his arrest or detention, his right to remain silent, his right against self incrimination, his right to the assistance of counsel and, if indigent, his right to court appointed counsel.
The adoption of this provision was intended to not only incorporate the protection of the Miranda v. Arizona decision under the U.S. Constitution, but to enhance it. State in the Interest of Dino, 359 So.2d 586, 589 (La.), cert. denied, 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978) (emphasis added). Transcripts of the 1973 Constitutional Convention establish that by specifying that this provision applied to any person "arrested or detained," a broad construction was intended of the situations under which Miranda warnings must be given. Id. at 590. Moreover, because our Constitution expressly grants protections that were merely found to be implied in the U.S. Constitution, subsequent constrictions in federal interpretations of Miranda do not govern a determination of rights under Article I, Section 13. Id.; see also State v. Menne, 380 So.2d 14, 19 (La.), cert. denied, 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980). I therefore cannot agree with the majority's use of the Bengivenga analysis, which focusses on "formal arrest," rather than the State v. Thompson test of "significant detention" held to apply under the Louisiana Constitution.
Applying the four factors of the Thompson test to the facts of this case, I find that the incriminating statements at issue here were obtained during the defendants' "significant detention" within the intendment of Article I, Section 13. Each defendant was selected for an "interview" because they had been observed pocketing money after a non-revenue transaction was recorded. Although Mr. Moore denied that they were thus "suspects," he acknowledged that his observations resulted in his "suspicion" of criminal activity. Each was then summoned by a superior for a closed-door meeting with several auditors that lasted anywhere from one to three hours, depending on how long it took a particular defendant to admit wrongdoing. Mr. Moore testified that the defendants were not told they could not leave, and even explained *536 that one of them had been "positioned... to where she [could] walk out of the door if she wanted to." This does not establish, however, that the defendants reasonably could believe they could end the questioning and leave at anytime. Most significantly, when asked the purpose of the interviews, Mr. Moore responded that "the purpose was to determine whether the misclassification of these transactions resulted in State funds being taken." I thus find it beyond a doubt that each defendant had been "detained in connection with the investigation... of [an] offense" and thus should have been advised of the rights specified in Section 13.
I must also disagree with the majority's conclusion that because the defendants were interrogated by a Legislative Auditor, rather than a "law enforcement officer," there was no need to comply with Article I, Section 13. Although this section specifies additional rights that attach when "a criminal prosecution" is instituted, I see nothing in the wording of the sentence at issue here that would suggest these protections only exist when certain "state actors" conduct a criminal investigation but not others. Mr. Moore not only acknowledged that his office had a legal duty to report suspected wrongdoing to the District Attorney, as provided by La. R.S. 24:516 A(2), but that it was "part of the Legislative Auditor's procedures .... to interview the suspect and document it" before any referral for prosecution.[3] Because Article I of our Constitution enumerates those rights that "are inalienable by the state and shall be preserved inviolate by the state," La. Const. Art. I, § 1, I would hold that the protections of Section 13 apply to any investigative detention by a government agent, including those at issue here.
NOTES
[1] Although the statute contains the word "purposes" instead of "purports," the provision contains a footnote making the correction and referencing Louisiana Supreme Court cases.
[2] The Louisiana Supreme Court, in State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272, neutrally observed that the court in Martin "seized upon LSA-R.S. 15:451 as an independent statutory ground, apart from the motion to suppress unconstitutionally obtained evidence provided for by LSA-C.Cr.P. Art. 703, to exclude involuntary confessions made in the absence of police misconduct." 655 So.2d at 279, n. 7.
[3] Transcript of hearing July 18, 1997, pp. 19-20.