NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

KA 21-118

STATE OF LOUISIANA

VERSUS

JOSEPH MICHAEL ELIE, III

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 344,498
HONORABLE MARY LAUVE DOGGETT, DISTRICT JUDGE

**********

BILLY H. EZELL
JUDGE

**********

Court composed of Billy H. Ezell, John E. Conery, and Van H. Kyzar, Judges.

AFFIRMED

**J. Phillip Terrell, Jr.**
**District Attorney**
**Catherine L. Davidson**
**Assistant District Attorney**
**Ninth Judicial District**
**P.O. Box 7358**
**Alexandria, LA 71306-7358**
**(318) 473-6650**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**P. O. Box 2125**
**Lafayette, LA 70502**
**(337) 366-8994**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Joseph Michael Elie, III**

**Joseph Michael Elie, III**
**River Bend Detention Center**
**9450 Hwy 65 South**
**Lake Providence, LA 71254**

**EZELL, Judge.**

Defendant, Joseph Michael Elie, III, was charged by bill of information filed on July 9, 2019, with second degree battery, a violation of La.R.S. 14:34.1. Trial by jury commenced on January 7, 2020, and Defendant was found guilty as charged on January 9, 2020. On August 17, 2020, Defendant was sentenced to serve seven years at hard labor.

A "Notice of Appeal with Designation of Record and Motion to Appoint Appellate Counsel" was filed on September 18, 2020. The record was lodged with this court on February 10, 2021. Defendant now asserts, in his counsel-filed claim, that the State failed to prove he inflicted serious bodily injury upon the victim. He also asserts, pro se, that the victim's testimony conflicts with cell phone location data. These claims lack merit.

## FACTS

The Defendant was convicted of committing a second-degree battery upon Jasmine Duncatel.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

## ASSIGNMENTS OF ERROR

In his counsel-filed assignment of error, Defendant contends the State failed to sufficiently prove that he was guilty of second-degree battery because it failed to prove he inflicted serious bodily injury. Counsel for Defendant acknowledges that the victim, Jasmine Duncatel, testified he punched her and slammed her head into the hood of a car, among other things, and did so without her consent. Thus, the

evidence was sufficient as to identity and the fact that a battery took place. However, counsel asserts the facts do not support a finding that Duncatel suffered serious bodily injury.

In his pro se brief, Defendant contends the victim's testimony that the altercation took place on Madeline Street conflicts with cell phone location data and cannot be relied on to establish that an altercation took place on September 9, 2018, on Madeline Street. Defendant argues that location data did not place him on Madeline Street or other streets near that location, creating a conflict with Ms. Duncatel's testimony. Thus, there is a reasonable doubt that he ever made contact with Ms. Duncatel.

As both assignments of error relate to the sufficiency of the evidence, this court will address them collectively.

> The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Captville*, 448 So.2d 676 (La.1984) ). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson*, 96-1048 (La. 10/4/96), 680 So.2d 1165; *State v. Lubrano*, 563 So.2d 847 (La.1990) ). The appellate court's function is not to assess the credibility of witnesses or to reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.
>
> The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than insuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at

1270 (quoting *State v. Lambert*, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726-27). Our supreme court has stated:

> However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall*, 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve " 'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.' " *McDaniel v. Brown*, 558 U.S. 120, 133–34, 130 S.Ct. 665, 674, 175 L.Ed.2d 582 [ ( 2010) ] (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) ). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville*, 448 So.2d 676, 680 (La.1984).

*State v. Strother*, 09-2357, pp. 10-11 (La. 10/22/10), 49 So.3d 372, 378.

*State v. Bias*, 18-268, 18-665, pp. 2-3 (La.App. 3 Cir. 2/6/19), 265 So.3d 821, 822-23 (alterations in original), *writ denied*, 19-416 (La. 4/22/19), 268 So.3d 300.

> Defendant . . . contends the injuries he inflicted . . . do not rise to the level of serious bodily injury within the definition of La.R.S. 14:34.1. To sustain a conviction for second degree battery under the statute, the State must prove beyond a reasonable doubt the injury inflicted "involved unconsciousness, extreme physical pain or protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or a substantial risk of death." *Id.* The term extreme physical pain refers to a condition which most people of common intelligence can understand. *State v. Thompson*, 399 So.2d 1161, 1168 (La.1981). It is considered subjective in nature and susceptible to interpretation. *Id.*

*State v. Jackson*, 02-1250, pp. 3-4 (La.App. 3 Cir. 2/5/03), 838 So.2d 841, 844, *writ denied*, 03-832 (La. 10/17/03), 855 So.2d 759.

Corporal Huy Le responded to the complaint from Ms. Duncatel, who was eight months pregnant, on September 9, 2018, at 6:48 p.m. Ms. Duncatel told Corporal Le that at 1:00 a.m. on September 9 she and Defendant had a verbal argument, and Defendant grabbed her hair and slammed her into the hood of a vehicle. Defendant then punched and hit her while she was on the ground. Ms. Duncatel reported that she was unconscious for a few seconds. A second incident occurred at 6:40 p.m. the same day. At that time, Defendant pulled up to Ms. Duncatel's house and threatened to kill her. She then called police.

Ms. Duncatel told Corporal Le she just wanted to make a report. Corporal Le told her the report would be on file and to go to the police department to press charges. She did not ask for medical attention, and he did not ask her if she would like him to call an ambulance. Ms. Duncatel's injuries were as depicted in the photos admitted by the State.

Sergeant Wesley Matthews took photos of the complainant, Jasmine Duncatel, who was noticeably pregnant at the time. Sergeant Matthews described the pictures and what they depicted: State's Exhibit 2 - redness to the right cheek, a small cut on the lip, a red mark under the eye, "purple and swollen and red" above the eye, and what appeared to be blood in the right eye; State's Exhibit 3 - red and swollen ear, and blood and a cut on the ear; State's Exhibit 4 - swelling and discoloration to the eye; State's Exhibit 5 - redness to the front of the face, the right temple, and toward the bottom of the ear; and State's Exhibit 6 - a cut and abrasion at the bottom of the knee and some swelling. On cross-examination, Sergeant Matthews was questioned about whether Ms. Duncatel had a black eye

and indicated there was bruising under the left eye. He also testified that her bottom lip was "busted."

Corporal Thomas Rodney interviewed Ms. Duncatel on September 10, 2018. Corporal Rodney then sought a warrant for Defendant's arrest. The Affidavit for Arrest Warrant stated, in pertinent part:

> On 9/09/2018 at approximately 1850 hours Cpl Le was dispatched to 2423 Madeline St in reference to a domestic battery. Victim Jasmine Duncatel reported that her ex-boyfriend Joseph Elie III slammed her head into the hood of a car before punching her multiple times in the head. Duncatel reported to Cpl Le that she lost consciousness or blacked out during the altercation. Duncatel reported that the incident happened at approximately 0100 hours. Visible injuries to her face and knew [sic] were observed. Photographs were taken.
>
> . . . .
>
> On 09/10/2018 I made contact with Jasmine Duncatel . . . . Duncatel reported that the incident in which she was battered occurred after Elie confronted her about text messages that he found and didn't like. Duncatel said she had been riding around with Elie and that upon returning home he confronted her. Duncatel stated that they were parked in front of her house and that he attacked her on the roadway. Duncatel reported that Elie punched her in the head and face multiple times and slammed her head into the hood of the vehicle. When I asked Duncatel about their relationship she reported that he was her ex-boyfriend, but she is currently pregnant with his child. . . . When I asked Duncatel about blacking out she stated that after being thrown to the ground she blacked out and upon waking up she observed Elie driving away.

(State's Exhibit 7.) Corporal Rodney testified that Ms. Duncatel did not know how long she was unconscious. He believed she stated, "possibly seconds, possibly minutes." She ultimately said she did not know how long, but Defendant was leaving when she came to. In her statement, Ms. Duncatel said, "It was probably a couple of minutes. I don't know. I just know he wind up stop [sic] hitting me as I was trying to get up and when I got up saw [sic] that he was driving off or that he had drove [sic] off." Ms. Duncatel looked as she did in the photographs admitted

5

by the State. Ms. Duncatel told him she wanted to press charges, and she may go to the hospital.

Corporal Rodney was asked where the incident occurred and responded: "[T]he incident occurred on Madeline Street in front of her residence but not directly in front as if, as if it would have been you know just down from her residence or maybe the next house over, in the street." Her statement indicated it occurred "the corner away" from her home. The officer assumed her statement meant in front of her house.

Jasmine Duncatel testified she was eight and one-half months pregnant on September 8, 2018, which was the day of her baby shower. Defendant was the father of her child. She returned home a little after 7:00, and Defendant, who had returned from Atlanta, Georgia that day, and his mother were in front of her house. Ms. Duncatel lived on Madeline Street, which was near Chester Street and Twenty-Fourth Street. She and Defendant talked for a while then left her home walking, ending up by Rapides Street. They got a ride from her cousin off Garden Street and went to Hickory Hill, where Defendant got a car from his other pregnant girlfriend, Rakeishala. The two then went for a ride, during which they argued about her getting text messages from other men. They probably went down Bolton Street and in neighborhoods. On 12th Street or near Elliot Street she got out of the car but ended up getting back in. They got back on the highway and went to Lecompte. Ms. Duncatel clarified that this was the first time they went to Lecompte and rode around. They were previously just riding. Defendant later headed back toward Alexandria on Interstate 49. A block away from her house at approximately one something in the morning, the conversation got heated. Therefore, she got out of the car at the corner and decided to walk home.

6

Defendant subsequently stopped the car in the middle of the street, where an altercation took place. Ms. Duncatel tried to push Defendant off her, and he grabbed her head and hit it on the hood of the car.

Ms. Duncatel explained the events:

A. After my head was slammed on the car, I'm steady trying to fight him off. As we got off the car, he started hitting me in my face. So my head is down so he won't hit me in my mouth so he's constantly hitting me in my eyes. At some point he slammed me on the ground and I think once my face hit the ground, I felt his foot hit my head. So, I'm on the ground. I think I blacked out. I don't remember when I came to, but when I did, I heard the cars, the tires spinning, to let me know he was gone. So when I looked up, I kind of seen the back of the car flying up . . . 23rd Street. So I knew he was gone and it was safe to get up. I got up and ran home.

Q. And you said that you blacked out?

A. Yes.

Q. Tell us about that. I mean, describe that for us the best you can.

A. I say I blacked out like once my head was hitting the ground. I didn't remember so much and as I was getting up it was like dark and I had like black stars spinning around my head so that's what made me feel like I blacked out and I didn't know like - once it stopped, the last thing I can really recall is him kicking me in my head and that's when after a while I heard the tires spinning so that's how I knew he was gone.

When she got up, she saw stars, and her head was spinning. She did not know how long she blacked out. She did not give Defendant permission to hit her. She was in "a lot of pain" and afraid to go to the doctor. She guessed she never mentioned Defendant kicking her in the head to police. Ms. Duncatel stated she was probably confused that night and did not remember everything. When Defendant slammed her to the ground, her head hit the ground.

7

Ms. Duncatel did not know what time the two stopped during their trip because she left her phone at her home and did not have a watch. Defendant called Ms. Duncatel to the stand to retrace her steps.

Defendant returned to Duncatel's house the next day at 8:30 a.m. He also returned that evening and threatened to kill her, so she called police. Pictures taken by police did not represent how she normally looked. The injuries depicted were caused by Defendant.

Ms. Duncatel was questioned regarding whether she called Defendant at 7:38, 11:54, and 11:57 p.m. on September 8.[1]

Rosalyn Heckard is Ms. Duncatel's sister. Heckard testified that she believed Defendant sent her a message on her Facebook Messenger account regarding the events with Ms. Duncatel. The message was sent on September 22, 2018, at 11:54 a.m. and stated, in pertinent part: "Only after did I beat Jazz ass [sic] not for cheating but because she didn't have enough respect for herself and the child she carrying [sic]." Heckard saw Ms. Duncatel's face on September 9, and it was "really swollen, tremendously swollen," and she was bruised "really bad."

Sheena Vaughn was Ms. Duncatel's friend. She testified that the morning after Duncatel's baby shower, Duncatel called her, stating Defendant had "jumped on her that night" and wanted Ms. Vaughn to pick her up. Ms. Duncatel was afraid Defendant was going to "pop up." Ms. Vaughn went to Ms. Duncatel's residence. While Ms. Duncatel was explaining to Ms. Vaughn what happened to her, Defendant walked into Ms. Duncatel's room. Defendant spoke to Ms. Vaughn.

---

[1]There was no indication if these calls were from AT&T phone records submitted by Defendant or whether the time represented was Universal Time Coordinated or Central Standard Time.

"[H]e basically was saying that what, what was he supposed to do and I told him I mean you could have hurt her and you could have hurt the baby and he said well, if I wanted to step on her I could've been [sic] stepped on her." "Meaning if he wanted to kill her or hurt her or anything, he could have."

Samuel Allen, a fire investigator, testified that Ms. Duncatel provided two phone numbers for Defendant. Thereafter, he got a warrant for phone records from AT&T for 12:00 a.m. on September 5, 2018, until 11:59 p.m. on September 12, 2018. To Allen's knowledge, Defendant possessed the phone with one of the numbers on September 9, 2018. According to Allen, the phone records had to be adjusted from UTC time to the time zone the person resided in.

Mr. Allen was investigating an attempted aggravated arson at Ms. Duncatel's residence between September 9 and 10, 2018. He prepared an affidavit in support of an arrest warrant for Defendant in relation to that offense.

Edward Butler, an investigator for the Public Defender's Office, reviewed Ms. Duncatel's statement to police and phone records from September 8 and 9. He indicated the longitude and latitude on the records represented the location of the phone. Mr. Butler testified regarding the time of certain calls on September 8 and the location of the phone at those times as follows: 7:38 - in or around Chunky, Mississippi; 8:22 - around Brandon, Mississippi; 8:24 to 8:28 p.m. - Brandon, Mississippi; 8:29 to 8:30 - between Brandon and Pearl, Mississippi; 11:17 to 11:19 - near Jena, Louisiana; 11:23 - near Deville, Louisiana; 11:52 and 11:57 - near North McArthur Drive in Alexandria, Louisiana; 11:57 - near Browns Bend Road in Alexandria; 12:00 a.m. to 12:39 a.m. - Hickory Street; 12:39 - Murray Street; 12:48 and 12:49 - Hickory Street; 1:03 - "(inarticulate) Road"; 1:32 and 1:34 - Hickory Street; 2:15 - Enterprise Road in Alexandria; 2:21 to 2:24 - Hickory

Street; 2:30 Magnolia in Alexandria; 3:42 to 3:58 - Enterprise Road; 6:14 a.m. - "[a]round South 71" between Alexandria and Lecompte; 6:15 to 6:58 - in the area of Robinson Bridge Road in Lecompte; 7:02 - in the area of 71 South; and 7:26 to 7:49 - Enterprise Road in Alexandria. He testified that from 7:38 on September 8 to 7:49 on September 9, Defendant was not on Madeline Street. Mr. Butler reviewed the records in the format they were in when given to him. He did not deal with UTC time on this case and had never dealt with UTC time.

Lieutenant Stephen Phillips testified that AT&T records were typically in UTC time, and those submitted as Defense Exhibit 2 were in UTC time. He testified he lived in the central standard time zone, and that September fell in Daylight Saving Time, resulting in a five-hour difference from UTC time. According to Lieutenant Phillips, the longitude and latitude found on the phone records indicated the cell tower location which the electronic device connected to in order to make a transmission.

*Serious Bodily Injury*

Defendant contends Ms. Duncatel's confusion about whether she blacked out or lost consciousness raises doubt about whether the element of serious bodily injury was proven. Defendant asserts Ms. Duncatel testified that she in fact lost consciousness but stated, "'**I think** I blacked out.'" Ms. Duncatel further stated she saw "'black stars spinning around my head so **that's what made me feel like** I blacked out.'" Defendant avers that when the victim is not sure she lost consciousness, the jury cannot fill in the gaps and find sufficient evidence. The Defendant further claims the State could not prove extreme physical pain because Ms. Duncatel merely testified she was in a lot of pain.

10

Ms. Duncatel did testify that she thought she blacked out, and she felt like she blacked out. However, she was asked:

Q. And you said that you blacked out?

A. Yes.

She also testified that the last thing she could recall was Defendant kicking her in the head and later hearing spinning tires. She explained that when she tried to get up it was "like dark," and she had black stars spinning around her head. The testimony of both Corporal Le and Corporal Rodney support Ms. Duncatel's testimony. On September 9 she told Corporal Le that she was unconscious for a few seconds and told Corporal Rodney on September 10 that she blacked out.

The jury heard this testimony and weighed the credibility of the witnesses. Any rational trier of fact could have found the evidence proved beyond a reasonable doubt that Ms. Duncatel lost consciousness. Thus, the State proved the Defendant inflicted serious bodily injury upon Ms. Duncatel.

Because the evidence is sufficient to find Ms. Duncatel was unconscious, we have not addressed Defendant's claim regarding extreme physical pain.

*Cell Data*

Defendant contends cell phone data proves he was not on Madeline Street on the date in question. Although Butler testified the data in the AT&T phone records placed the phone at specific locations at the time particular calls were made, Lieutenant Phillips testified the longitude and latitude provided in Defendant's Exhibit 2 represented the location of the cell tower the electronic device connected to in order to make a transmission. Based on Lieutenant Phillips' testimony, we find the cell data does not exonerate Defendant. Moreover, Ms. Duncatel placed Defendant on or near Madeline Street and testified that he beat her. The jury's

11

verdict clearly indicates it believed Defendant committed the offense, and this court cannot second-guess the jury's credibility determinations. Thus, we find Defendant's pro se assignment of error lacks merit.

For the reasons set forth herein, Defendant's conviction for second degree battery is affirmed.

## CONCLUSION

Defendant's conviction is affirmed.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3.